540 F.2d 1141
 9 ERC 1327, 176 U.S.App.D.C. 362, 6
Envtl. L. Rep. 20,661
 COMMITTEE FOR HUMANE LEGISLATION, INC., et al.,
v.
Elliot L. RICHARDSON, Secretary of Commerce, U.S. Department
of Commerce, et al.; American Tunaboat Association
and Tuna Research Foundation, Appellants.
FUND FOR ANIMALS et al.
v.
Elliot L. RICHARDSON, Secretary of Commerce, et al.;
American Tunaboat Association and Tuna Research
Foundation, Appellants.
COMMITTEE FOR HUMANE LEGISLATION, INC., et al.,
v.
Elliot L. RICHARDSON, Secretary of Commerce, U.S. Department
of Commerce, et al.; Fishermen's Union of America, Pacific
and Caribbean Area, and Local 33, United Cannery and
Industrial Workers of the Pacific, Appellants.
COMMITTEE FOR HUMANE LEGISLATION, INC., et al.,
v.
Elliot L. RICHARDSON, Secretary of Commerce, U.S. Department
of Commerce, et al., Appellants,
American Tunaboat Association et al., Intervenors.
FUND FOR ANIMALS et al.,
v.
Elliot L. RICHARDSON, Secretary of Commerce, et al., Appellants,
American Tunaboat Association et al., Intervenors.
 Nos. 76-1479 thru 76-1483.
 United States Court of Appeals,
District of Columbia Circuit.
Submitted Without Argument.
 Decided Aug. 6, 1976.
 
 William H. Allen, Washington, D.C., was on the brief for appellants American Tunaboat Ass'n and Tuna Research Foundation.
 Patrick C. O'Donoghue, Washington, D.C., was on the brief for appellants Fishermen's Union of America and United Cannery and Industrial Workers.
 Peter R. Taft, Asst. Atty. Gen., and Edmund B. Clark and Robert A. Kerry, Attys., Dept. of Justice, Washington, D.C., were on the briefs for the federal appellants-appellees.
 William A. Butler and John F. Hellegers, Washington, D.C., were on the brief for appellee Environmental Defense Fund, Inc.
 Bernard Fensterwald, Jr., Washington, D.C., was on the brief for appellees Fund for Animals et al.
 Ronald A. Zumbrun and Raymond M. Momboisse, Sacramento, Cal., and John H. Midlen, Jr. and Glen E. Davis, Washington, D.C., were on the brief for Pacific Legal Foundation as amicus curiae.
 Murdaugh Stuart Madden, Washington, D.C., was on the brief for Humane Society of the U.S. as amicus curiae.
 Before WRIGHT, ROBINSON, and WILKEY, Circuit Judges.
 PER CURIAM:
 
 I. INTRODUCTION
 
 1
 In this appeal we are asked to review a judgment of the District Court[1] that the Secretary of Commerce, through the Director of the National Marine Fisheries Service (NMFS), has violated the provisions of the Marine Mammal Protection Act of 1972[2] by granting to the American Tunaboat Association a general permit for the practice of purse-seine fishing for yellowfin tuna "on porpoise." We concur with the conclusion of the District Court that the permit for fishing "on porpoise" was not issued in compliance with the requirements of the Act. Rather than order an immediate halt to operations of the tuna fleet, however, we have determined to stay the effect of the District Court order until January 1, 1977, for reasons stated hereinafter.
 
 II. BACKGROUND
 
 2
 A. Purse-Seine Fishing "on Porpoise"
 
 
 3
 Prior to 1960 the most common method of fishing for yellowfin tuna was use of pole, line, and live bait. In the eastern tropical Pacific yellowfin tuna fishery, fishermen observed in the late 1950's that yellowfin habitually associate with certain species of dolphin (commonly called porpoise), and began setting their nets "on porpoise." When porpoise are spotted at the ocean surface, speedboats are deployed to herd them to where the net will be set. The tuna follow below the porpoise. The porpoise then are encircled with a cup-like purse-seine net, the open bottom of which is then drawn closed in the manner of a drawstring purse,[3] trapping both the porpoise and the tuna beneath.
 
 
 4
 Although efforts are made to free the trapped porpoise,[4] purse-seine fishing has resulted in substantial incidental deaths of porpoise. Porpoise are air-breathing mammals, and may be suffocated if they become entangled in the net, or drowned as a result of shock or physical injury. The number of incidental porpoise deaths in recent years has been as follows:[5]
 
 
 5
 The average number of porpoise killed each time purse-seine nets are "set" was 70 in 1971, 43 in 1972, 19 in 1973, 12 in 1974, and 17 in 1975. SWFC Report at 87, Table 2.
 
 
 6
 The effectiveness of purse-seine fishing has led to dramatic increases in its use by the United States tuna fishing fleet. The catch of yellowfin tuna caught by United States purse-seiners on porpoise was 99,000 tons in 1974, or 60 percent of the total United States yellowfin catch (of 165,000 tons) and about 43 percent of the total United States tuna catch. For the period 1971-1974 purse-seiners fishing on porpoise accounted for 72 percent of the total catch of yellowfin. FEIS at 40.
 
 B. The Marine Mammal Protection Act of 1972
 
 7
 The Marine Mammal Protection Act of 1972 was addressed in part to the growing problem of porpoise deaths incidental to commercial fishing. The Act was founded on a concern that certain species of marine mammals were in danger of extinction or depletion as a result of man's activities,[6] and a concomitant belief that those species "should not be permitted to diminish below their optimum sustainable population."[7] A moratorium was imposed on taking and importation of all marine mammals,[8] with a two-year exemption from the moratorium for taking of marine mammals incidental to the course of commercial fishing operations.[9] Although the Secretary of Commerce was permitted to license incidental taking of marine mammals subsequent to the two-year exemption, the statute directs that "(i)n any event it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate."[10]
 
 
 8
 The permits to be issued after the exemption period expired on October 21, 1974 were authorized under 16 U.S.C. § 1374, which in turn required compliance with regulations issued under Section 1373. Section 1374 requires that the permit specify, inter alia, "the number and kind of animals which are authorized to be taken or imported," and the location, period, and method of the authorized taking. Section 1374(b)(2), (c). The applicant for a permit "must demonstrate to the Secretary that the taking or importation of any marine mammal under such permit will be consistent with the purposes of this chapter and the applicable regulations established under section 1373 of this title."[11] Section 1374(d)(3) (emphasis added).
 
 
 9
 Section 1373, in turn, authorizes the Secretary to promulgate regulations "on the basis of the best scientific evidence available" for permits for taking marine mammals, "as he deems necessary and appropriate to insure that such taking will not be to the disadvantage of those species and population stocks and will be consistent with the purposes and policies set forth in section 1361 of this title."[12] The Act requires that prior to promulgating any such regulations
 
 
 10
 the Secretary shall publish and make available to the public either before or concurrent with the publication of notice in the Federal Register of his intention to prescribe regulations under this section
 
 
 11
 (1) a statement of the estimated existing levels of the species and population stocks of the marine mammal concerned;
 
 
 12
 (2) a statement of the expected impact of the proposed regulations on the optimum sustainable population of such species or population stock;
 
 
 13
 (3) a statement describing the evidence before the Secretary upon which he proposes to base such regulations; and
 
 
 14
 (4) any studies made by or for the Secretary or any recommendations made by or for the Secretary or the Marine Mammal Commission which relate to the establishment of such regulations.
 
 
 15
 16 U.S.C. § 1373(d).
 
 C. The Regulations
 
 16
 On March 13, 1974 NMFS published notice of its intent to prescribe regulations for taking porpoise incidental to commercial fishing. 39 Fed.Reg. 9685. It took this action despite its professed lack of knowledge as to the actual populations of porpoise, the optimum sustainable populations, or the effect of the takings on the optimum sustainable populations of porpoise.[13] Final regulations[14] were promulgated on September 5, 1974, 39 Fed.Reg. 32117, and the American Tunaboat Association was granted a general permit[15] for the period October 21, 1974 to December 31, 1975 under which fishermen holding certificates of inclusion in the general permit were permitted to take an unlimited number of porpoise.[16]
 
 
 17
 Despite subsequent warnings by the Marine Mammal Commission[17] that the levels of incidental porpoise deaths would remain unacceptably high,[18] NMFS did not impose a quota, although it later amended its regulations to require improved gear and techniques.[19] The number of porpoise killed by commercial fishermen increased from 97,800 in 1974 to about 130,000 in 1975.[20]
 
 
 18
 The American Tunaboat Association's application for renewal of its permit[21] was granted on December 19, 1975.[22] Although NMFS published population estimates for two species of porpoise, it again stated that it could not make any statement as to the optimum sustainable populations or the effect of the proposed taking,[23] and determined to set no quota as to incidental deaths unless it appeared that the total number of deaths would exceed 70 percent of the final 1975 estimate.[24] Although the Marine Mammal Commission again warned that there was no basis for assurance that porpoise stocks would not be harmed by the taking,[25] NMFS expressed its belief in proposing regulations that existing porpoise populations would neither increase nor decrease as a result of the taking.[26]
 
 
 19
 Appellees, various environmental protection organizations, filed suit in 1974 and 1975 to challenge the legality of the permits issued the American Tunaboat Association. The suits were consolidated, and on May 11, 1976 the District Court entered summary judgment for plaintiffs. The court found that the overriding purpose of the Marine Mammal Protection Act was protection of the animals' interests, and held that the Act required (1) that NMFS find that the effect of any proposed taking on the optimum sustainable populations of the species involved not be to the disadvantage of the animals, (2) that the permit specify the number and kind of animals which may be taken, and (3) that the applicant for a permit demonstrate that the taking will serve the purposes of the Act. The court declared the American Tunaboat Association's general permit void and ordered that no further permit be issued until the Act has been complied with. The effect of the decision has been stayed pending further order of this court.III. ARGUMENT
 
 
 20
 The first major issue presented by this appeal is whether NMFS has discretion under the Marine Mammal Protection Act of 1972 to issue permits for incidental taking of marine mammals in the course of commercial fishing when estimates of the optimum sustainable populations of the species involved and of the effect of that taking upon the optimum sustainable populations are not available.
 
 
 21
 As a preliminary matter, we may state our agreement with the District Court's conclusion that the Act was to be administered for the benefit of the protected species rather than for the benefit of commercial exploitation.[27] That general legislative intent, however, is not dispositive of the instant question. Congress was confronted directly with the conflict between protection of the porpoise and protection of the American tuna fishing industry; one result of that conflict was the express two-year exemption granted commercial fishermen from the moratorium on taking marine mammals.[28] More significantly for this case, the committee reports contain strong language indicating that the Act was not intended to force tuna fishermen to cease operations:
 
 
 22
 (Section 1373(b)) lists the general criteria which may be considered by the Secretary in the process of prescribing regulations under the Act. These include a wide range of factors such as the effect of limitations on present and future animal populations, U.S. treaty requirements, ecological and environmental considerations, the conservation and development of fishery resources and economic and technical feasibility.
 
 
 23
 The Secretary, for example, in regulating the operations of the tuna industry with respect to the incidental catching of porpoises must consider the technical capability of these fishermen to avoid injury to porpoises. It is not the intention of the Committee to shut down or significantly to curtail the activities of the tuna fleet so long as the Secretary is satisfied that the tuna fishermen are using economically and technologically practicable measures to assure minimal hazards to marine mammal populations.
 
 
 24
 Marine Mammal Protection Act of 1972, Senate Commerce Committee, S.Rep.No.92-863, 92d Cong., 2d Sess. 16 (June 15, 1972). See also Marine Mammal Protection Act of 1971, House Committee on Merchant Marine and Fisheries, H.R.Rep.No.92-707, 92d Cong., 1st Sess. 20-21 (December 4, 1971).
 
 
 25
 Appellants also have referred the court to oversight hearings on the Marine Mammal Protection Act held in years succeeding passage of the Act. The 1973, 1974, and 1975 hearings establish (1) that the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries was kept informed that NMFS was issuing permits for taking porpoise incidental to commercial tuna fishing without knowing what the optimum sustainable populations of the porpoise species were, or what the effect of the taking would be,[29] and (2) that the former chairman of the Subcommittee, Representative John D. Dingell, stated on the first day of the first oversight hearings that a "rule of reason" would be followed with respect to incidental taking of porpoise, and that "(i)t was not our intention that commercial fishing would be brought to a halt."[30]
 
 
 26
 It is clear that Congress did not intend that the Marine Mammal Protection Act would force American tuna fishermen to cease operations; the Act does not prohibit purse-seine fishing on porpoise.[31] It is equally clear, however, that Congress intended that the requirements of the Act be complied with. Perhaps most telling in this regard is the most recent oversight hearing of the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, held after entry of the District Court decision in the instant case.[32] Congressman Robert L. Leggett, the present chairman of the Subcommittee, reiterated throughout the hearings that, although he did not wish to see the tuna fleet's permit cancelled, he also believed that the District Court had correctly interpreted the law as written.[33]
 
 
 27
 Number one, as Judge Richey pointed out colleague Dingell, when we enacted this legislation, stated before issuing any permits for the taking of marine mammals, the Secretary must first have proven to his satisfaction that any taking is consistent with the purposes and policies of the Act.
 
 
 28
 That is to say that taking will not be to the disadvantage of the animals concerned. If he cannot make this finding, he cannot issue a permit. It is that simple.
 
 
 29
 It turns out that we are really both right. We have got a certain intention, the judge is interpreting the plain meaning of the law, and in order for the intention that we want to be accomplished, that is to keep the tuna industry in business and still reach the objectives, we have to change the law. Because the law was rather explicit with respect to what it required.
 
 
 30
 Tr. 34, 187.
 
 
 31
 The specific requirements of the Act are indeed so clear as to require little discussion. 16 U.S.C. § 1373(d) requires that the Secretary publish, inter alia, a statement of "the estimated existing levels of the species and population stocks" of the marine mammals to be taken, and a statement of the expected impact of the takings on the optimum sustainable populations of the species.[34] As the House committee report explained, the Act was deliberately designed to permit takings of marine mammals only when it was known that that taking would not be to the disadvantage of the species:
 
 
 32
 In the teeth of this lack of knowledge of specific causes, and of the certain knowledge that these animals are almost all threatened in some way, it seems elementary common sense to the Committee that legislation should be adopted to require that we act conservatively that no steps should be taken regarding these animals that might prove to be adverse or even irreversible in their effects until more is known. As far as could be done, we have endeavored to build such a conservative bias into the legislation here presented.
 
 
 33
 H.R.Rep.No.92-707, supra, at 15, U.S.Code Cong. & Admin.News 1972, p. 4148. In promulgating the instant regulations in both 1974 and 1975, NMFS did not fulfill the requirement that it determine the impact of the takings on the optimum sustainable populations of the species of porpoise involved. The statement that "(t)here is no evidence that the porpoise populations would substantially increase or decrease as a result of the regulations and reissuance of the general permit"[35] is not at all responsive; the fact that actual stocks may be stable may supply little or nothing to the determination of effect on optimum sustainable populations.[36] We therefore affirm the judgment of the District Court on this issue.
 
 
 34
 The second line of argument in this appeal concerns the requirement of16 U.S.C. § 1374(b)(2)(A) that a permit "specify * * * the number and kind of animals which are authorized to be taken * * * ." The District Court held that NMFS had failed to satisfy this requirement inasmuch as no specified limit was placed on incidental takings. The Government has conceded on appeal that the Act requires that a permit contain a fixed number, and NMFS has amended 50 C.F.R. § 216.24(d)(2)(i)(A) to impose a limit of 78,000 on the total number of marine mammals which may be taken by those operating under the general permit. 41 Fed.Reg. 23680 (June 11, 1976).
 
 
 35
 Appellees contend, however, that the statute is not satisfied by aggregation of all marine mammals into one figure, relying on the express language of the Act that the permit specify both "number and kind." The determination whether the single quota established by NMFS is, in this case, in compliance with the Marine Mammal Protection Act may require development of evidence as to the suitability of aggregation in the context of purse-seine fishing on porpoise; it is a dispute which properly cannot be decided in the first instance by this court. We therefore remand the case to the District Court for prompt consideration and decision of this question.
 
 
 36
 The remaining statutory requirement relevant to this appeal is contained in 16 U.S.C. § 1374(d)(3): an applicant for a permit for taking marine mammals must demonstrate that the taking "will be consistent with the purposes of this chapter and the applicable regulations established under section 1373 of this title."[37] Again, the purpose of the requirement was stated clearly in the legislative history:If that burden is not carried and it is by no means a light burden the permit may not be issued. The effect of this set of requirements is to insist that the management of the animal populations be carried out with the interests of the animals as the prime consideration.
 
 
 37
 H.R.Rep.No.92-707, supra, at 18, U.S.Code Cong. & Admin.News 1972, p. 4151. The court has carefully examined the American Tunaboat Association's 1974 permit application and its 1975 renewal application.[38] Neither contains any discussion of the predicted impact of the proposed takings on the optimum sustainable population of the porpoise species involved, or otherwise displays consistency with the purposes of the Marine Mammal Protection Act. We concur in the judgment of the District Court that the applications were deficient under the terms of the Act and should not have been granted. We therefore affirm the judgment of the District Court.
 
 IV. REMEDIES
 
 38
 When this appeal was presented to the court on motions for stay pending review, it was represented by counsel for the Government that "(i)t is estimated that reasonably supportable scientific guesses at optimum sustainable populations of porpoise will not be available for 90 days." Motion of Federal Appellants for Stay Pending Appeal at 9. The request for stay was founded in part on the assertion that if ongoing research being conducted with the tuna fleet were permitted to continue figures could be obtained by autumn of this year. The court is now informed that "(i)t will take three to seven years for a scientifically valid figure." Brief for federal appellants at 21.
 
 
 39
 The court granted a stay pending appeal in the belief that compliance with the Act could be effected within a short time and invalidation of the American Tunaboat Association's general permit thereby averted. We cannot, however, approve the suggestion of NMFS that it might not be in compliance with the Act as much as a decade after enactment. Our obligation is to enforce the law as it is written; the court may not be turned from its course by a proffer of statements that Congress really did not mean what it said.[39]
 
 
 40
 The court is aware, however, that the immediate impact of this decision would be disastrous to the commercial fishermen operating under the general permit. In further consideration of the efforts by the Government to achieve good faith compliance with the requirements of the Act, and of the need to conduct ongoing gear studies throughout the entire fishing season,[40] we find it appropriate to continue our stay of the District Court order until January 1, 1977.
 
 
 41
 So ordered.
 
 
 
 [1]
 Committee for Humane Legislation, Inc. v. Richardson, 414 F.Supp. 297 (D. D.C.1976)
 
 
 [2]
 16 U.S.C. § 1361 et seq. (Supp. IV 1974)
 
 
 [3]
 See 40 C.F.R. § 216.24(d)(2) (1975), as amended, 40 Fed.Reg. 56899 (Dec. 5, 1975)
 
 
 [4]
 Speedboats are used to stretch the net in an open position to permit the porpoise to swim out of the net without becoming entangled. 40 C.F.R. § 216.24(d)(2)(vi). As the net is brought aboard the seining vessel, the porpoise tend to congregate at the extreme end of the net, while tuna swim back and forth between the porpoise and the seiner. The seiner then follows a "backdown" procedure whereby it is backed rapidly to cause the corkline of the net to submerge at the end where the porpoise are located. When tuna swim toward this escape route, the vessel slows and the corkline bobs to the surface. The "backdown" procedure allows a substantial number of porpoise to escape unharmed. Progress of Research on Porpoise Mortality Incidental to Tuna Purse-Seine Fishing for FY 1975, National Marine Fisheries Service, Southwest Fisheries Center (Aug. 8, 1975), at 54 (hereinafter SWFC Report); 40 C.F.R. § 216.24(d)(2)(vi)
 The net itself is provided with a safety panel, known as a Medina panel, of very fine mesh net along the outer edge of the net. 40 C.F.R. § 216.24(d)(2) (iv). The fine mesh panel is intended to help prevent entanglement of porpoise in the net. SWFC Report at 58-59. Other devices are being studied, such as a "porpoise apron" to prevent entrapment of porpoise during the backdown procedure, SWFC Report at 54-55, improved net gear to prevent delays in a seining operation, id. at 60-61, and methods of removing porpoise from the net manually, id. at 61-62.
 It is estimated that 98% of the netted porpoise are released, primarily through the backdown procedure, and that 2% die. SWFC Report at 51.
 
 
 [5]
 Final Environmental Impact Statement on promulgation of rules and proposed issuance of permits to commercial fishermen allowing the taking of marine mammals in the course of normal commercial fishing operations, Office of Resource Management, NMFS (Nov. 18, 1975) (hereinafter FEIS); 1975 data is from 40 Fed.Reg. 56899, 56900 (Dec. 5, 1975) (promulgation of regulations dealing with incidental taking of marine mammals in the course of commercial fishing operations)
 1971 312,400
 1972 304,600
 1973 175,000
 1974 97,800
 1975 130,000 (est.)
 
 
 [6]
 16 U.S.C. § 1361(1)
 
 
 [7]
 16 U.S.C. § 1361(2). "The term 'optimum sustainable population' means, with respect to any population stock, the number of animals which will result in the maximum productivity of the population of the species, keeping in mind the optimum carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." 16 U.S.C. § 1362(9). The House report on the proposed legislation emphasized that the benefit of the marine mammals was to be the paramount consideration:
 (M)arine mammals are resources of great significance and * * * it is congressional policy that they should be protected and encouraged to develop consistent with sound policies of resource management. The primary objective of this management must be to maintain the health and stability of the marine ecosystem; this in turn indicates that the animals must be managed for their benefit and not for the benefit of commercial exploitation.
 H.R.Rep.No.92-707, Committee on Merchant Marine and Fisheries, 92d Cong., 1st Sess. 22 (Dec. 4, 1971), U.S.Code Cong. & Admin.News 1972, pp. 4144, 4154 (emphasis added).
 
 
 [8]
 16 U.S.C. § 1371(a)
 
 
 [9]
 16 U.S.C. § 1371(a)(2):
 During the twenty-four calendar months initially following October 21, 1972, the taking of marine mammals incidental to the course of commercial fishing operations shall be permitted, and shall not be subject to the provisions of sections 1373 and 1374 of this title: Provided, That such taking conforms to such conditions and regulations as the Secretary is authorized and directed to impose pursuant to section 1381 of this title to insure that those techniques and equipment are used which will produce the least practicable hazard to marine mammals in such commercial fishing operations. Subsequent to such twenty-four months, marine mammals may be taken incidentally in the course of commercial fishing operations and permits may be issued thereof pursuant to section 1374 of this title, subject to regulations prescribed by the Secretary in accordance with section 1373 of this title. In any event it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate. The Secretary shall request the Committee on Scientific Advisors on Marine Mammals to prepare for public dissemination detailed estimates of the numbers of mammals killed or seriously injured under existing commercial fishing technology and under the technology which shall be required subsequent to such twenty-four-month period. The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards. The Secretary shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States.
 
 
 [10]
 Id
 
 
 [11]
 The House committee report found substantial safeguards in the requirement that a showing be made by the applicant for a permit:
 In every case, the burden is placed upon those seeking permits to show that the taking should be allowed and will not work to the disadvantage of the species or stock of animals involved. If that burden is not carried and it is by no means a light burden the permit may not be issued. The effect of this set of requirements is to insist that the management of the animal populations be carried out with the interests of the animals as the prime consideration.
 H.R.Rep. No. 92-707, supra note 7, at 18, U.S.Code Cong. & Admin.News 1972, p. 4151 (emphasis added).
 
 
 [12]
 16 U.S.C. § 1373(a). The Secretary is directed to consider the following factors:
 (1) existing and future levels of marine mammal species and population stocks;
 (2) existing international treaty and agreement obligations of the United States;
 (3) the marine ecosystem and related environmental considerations;
 (4) the conservation, development, and utilization of fishery resources; and
 (5) the economic and technological feasibility of implementation.
 16 U.S.C. § 1373(b).
 
 
 [13]
 "Estimates of porpoise kills by U.S. fishermen were 214,000 in 1970, 167,000 in 1971, and 228,000 in 1972. The importance of these kills in relation to optimum sustainable population is not known due to lack of knowledge of the sizes of porpoise populations and other population dynamics factors. Population modeling studies underway are scheduled to provide information on population sizes by October, 1974." 39 Fed.Reg. at 9685
 
 
 [14]
 See 16 C.F.R. § 216.24
 
 
 [15]
 See Application of American Tunaboat Association for a General Permit Under the Marine Mammal Protection Act of 1972, to Allow the Taking of Marine Mammals Incidental to Commercial Fishing (Sept. 18, 1974; Admin.Rec. Jan. 24, 1975); General Permit Under the Category: Encircling Gear; Yellowfin Tuna Purse Seining (NMFS Oct. 21, 1974; Admin.Rec. July 24, 1975), announced, 39 Fed.Reg. 38403 (Oct. 21, 1974)
 
 
 [16]
 After the American Tunaboat Association received its general permit, individuals were permitted to apply for inclusion within the permit. 16 C.F.R. § 216.24(c). Purse-seining under the general permit is restricted to use of certain gear and procedures. 16 C.F.R. § 216.24(d)(2)
 
 
 [17]
 The Marine Mammal Commission, created by 16 U.S.C. § 1401 et seq. (Supp. IV 1974), is an independent three-member commission of individuals knowledgeable in the fields of marine ecology and resource management. Among its duties it is to study and make recommendations to federal officials for protection and conservation of marine mammals. 16 U.S.C. § 1402(a)(4)
 
 
 [18]
 Before final regulations were promulgated the Marine Mammal Commission concluded that even use of advanced fishing techniques would not bring incidental porpoise deaths down to an acceptable level:
 Although progress has been made toward reducing porpoise mortality and serious injury incidental to commercial tuna fishing, the total kill and serious injury levels remain unacceptably high. Gear and techniques such as the Medina panel, the current indicator, the antitorque cable, the backdown procedures, and the training of skippers appear to contribute to some reduction in the rate of incidental mortality and serious injury. However, indications are that no matter how widely these new devices and techniques are utilized by the industry in the course of commercial tuna fishing operations, they will probably not, in themselves, produce an acceptably low rate of incidental kill and injury.
 Report from John R. Twiss, Jr., Executive Director, Marine Mammal Commission, to Robert W. Schoning, Director, National Marine Fisheries Service, July 30, 1974, at p. 2 (Admin.Rec. Jan. 24, 1975) (emphasis added). A subsequent report of scientific advisers to the Marine Mammal Commission, presented at hearings held in December 1975 to consider possible amendments to the purse-seine regulations, concurred in the inadequacy of both existing knowledge and proposed techniques:
 It is our conclusion that even the most conservative estimate of porpoise mortality in the Eastern Tropical Pacific Tuna Fishery about 100,000 animals in the U.S. Fishery in 1974 within the CYRA represents an unacceptably high level of mortality, both in terms of the specific charge of the Marine Mammal Protection Act to reduce the rate of such mortality and serious injury to insignificant levels approaching zero and in terms of the overall protection and conservation policies and objectives of the Act to maintain the health and stability of the marine ecosystem.
 The various data analyses are based upon a number of unverified assumptions and fail to consider several relevant factors. * * *
 Position Statement of the Subcommittee of the Scientific Advisers to the Marine Mammal Commission on the Porpoise-Tuna Problem, in Public Hearing on Possible Amendments to Existing Regulations Established Pursuant to the Marine Mammal Protection Act of 1972 Governing "Encircling Gear: Yellowfin Tuna Purse Seining," Dec. 10, 1974, Tr. 67.
 
 
 [19]
 40 Fed.Reg. 764 (Jan. 3, 1975)
 
 
 [20]
 See --- U.S.App.D.C. at ----, 540 F.2d at 1143-1144 supra
 
 
 [21]
 Application of the American Tunaboat Association for a General Permit Under the Marine Mammal Protection Act of 1972, to Allow the Taking of Marine Mammals Incidental to Commercial Fishing (Aug. 6, 1975; Admin.Rec. Dec. 9, 1975)
 
 
 [22]
 The regulations to govern the renewed permit prescribed certain gear modifications. 40 Fed.Reg. 41531 (Sept. 8, 1975)
 
 
 [23]
 "Optimum sustainable population levels have not been determined; therefore, no statement can be made as to the effect of the proposed action on optimum sustainable populations. The estimated annual incidental mortality rate on spotted dolphin for 1974 is 2.1 percent to 2.3 percent of the estimated population and for eastern spinner dolphin 1.8 percent to 2.8 percent of the estimated population. At these levels of incidental fishing mortality, the present population stocks are either stable or increasing or decreasing slightly. There is no evidence that the porpoise populations would substantially increase or decrease as a result of the regulations and reissuance of the general permit." 40 Fed.Reg. at 41536
 
 
 [24]
 40 Fed.Reg. 56899 (Dec. 5, 1975)
 
 
 [25]
 40 Fed.Reg. at 56899 ("the Commission could not, on the basis of reliable scientific information, arrive at a figure of permissible incidental mortality which could with reasonable assurance enable the principal stocks of porpoise to increase in size"); see Committee for Humane Legislation, Inc. v. Richardson, supra, note 1, 414 F.Supp. at 305
 
 
 [26]
 See note 23 supra
 
 
 [27]
 Appellants have sought to infer a different interpretation from 16 U.S.C. § 1361(6), which states the belief of Congress that marine mammals should be protected and encouraged "to the greatest extent feasible commensurate with sound policies of resource management * * *." To the extent that that phrase may imply a qualification of the legislative purpose, we believe it is sufficient to note that the section goes on to provide that "the primary objective of this management should be to maintain the health and stability of the marine ecosystem." We also note that the explanation of this provision in H.R.Rep.No.92-707, U.S.Code Cong. & Admin.News 1972, p. 4154, stated that it "indicates that the animals must be managed for their benefit and not for the benefit of commercial exploitation." See note 7 supra
 
 
 [28]
 16 U.S.C. § 1371(a)(2) (see note 9 supra )
 
 
 [29]
 Hearings on Oversight of the Marine Mammal Protection Act of 1972 Before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, 93d Cong., Ser. No. 93-24 (Aug. 21 & 31, 1973, Jan. 16 & 17, 1974), at 64-67, 212-213, 364-366, 371-372; Hearings on Oversight of the Marine Mammal Protection Act of 1972 to Review the Implementation, Administration, and Enforcement of the Act, Before the Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries, 94th Cong., Ser. No. 94-16 (Oct. 21, 1975), at 28-29, 32
 
 
 [30]
 Hearings of Aug. 21, 1973 (see note 29 supra ) at 22
 
 
 [31]
 The major concern at the time of enactment was that the Marine Mammal Protection Act not be read to prohibit many forms of commercial fishing solely because those methods result in incidental deaths of marine mammals. Rep. Goodling, the senior minority member of the conference committee, expressed that concern when the conference committee report came to the House floor:
 In regard to those marine mammals taken accidentally or incidentally to commercial fishing operations, the conferees adopted a general goal that such damage should be "reduced to insignificant levels approaching a zero mortality and serious injury rate." I wish to make it crystal clear that this language in no way will or should result in the closure or drastic curtailment of the Nation's commercial fishing industry simply because the biological fact exists that some species of fish and marine mammals cannot be separated from a commonly shared food source in order to permit commercial fishing operations without the taking of a single marine mammal.
 
 
 [118]
 Cong.Rec. House 34642-34643 (Oct. 10, 1972). See Marine Mammal Protection Act of 1972, Conference Report, H.R.Rep.No.92-1488, 92d Cong., 2d Sess. 23 (Oct. 2, 1972), U.S.Code Cong. & Admin.News 1972, p. 4187
 We do not reach the question whether present levels of porpoise deaths incidental to commercial fishing constitute compliance with the requirement that deaths be reduced to insignificant levels.
 
 
 [32]
 Hearings on Oversight of the Marine Mammal Protection Act of 1972 and on H.R. 13865, A Bill to Amend the Marine Mammal Protection Act of 1972, 94th Cong., 2d Sess. (May 20, 21, 24, 1976). As of this writing the transcript of these hearings is available only in preliminary form. All citations are to the typed, uncorrected transcript
 
 
 [33]
 Hearings of May 20, 1976 (see note 32 supra ), Tr. at 33-35, 60, 88, 118, 187
 
 
 [34]
 See --- U.S.App.D.C. at ----, 540 F.2d at 1145-1146, supra
 
 
 [35]
 See note 23 supra
 
 
 [36]
 See comments at note 18 supra. The House committee report observed, with regard to the need for a sustainable population level, that certain whale stocks had not recovered in spite of a worldwide ban on their taking which had existed for several years. H.R.Rep.No.92-707, supra note 7, at 15
 
 
 [37]
 See --- U.S.App.D.C. at ---, 540 F.2d at 1145, supra
 
 
 [38]
 See notes 15 & 21 supra
 
 
 [39]
 A major subject of controversy in the instant appeals has been the extent to which the American tuna fishing industry would be harmed by withdrawal of the general permit for purse-seine fishing on porpoise pending completion of the actions necessary to bring the parties into compliance with the Act. We accept as sufficiently demonstrated that the tuna fleet would be seriously harmed by such a ban. The arguments, however, properly should be addressed to Congress rather than to the courts. Balancing of interests between the commercial fishing fleet and the porpoise is entirely a legislative decision, dictated at present by the terms of the Act
 
 
 [40]
 Affidavit of Robert W. Schoning, Director, National Marine Fisheries Service, May 25, 1976, Appendix A to Motion of Federal Appellants for Stay Pending Appeal