**FEDERATION OF JAPAN SALMON FISHERIES COOPERATIVE ASSOCIATION, Petitioners,**

v.

**Malcolm BALDRIDGE, et al., Respondents.**

**KOKECHIK FISHERMEN'S ASSOCIATION, et al., Petitioners,**

v.

**Malcolm BALDRIDGE, et al., Respondents.**

**CENTER FOR ENVIRONMENTAL EDUCATION, et al., Petitioners,**

v.

**Malcolm BALDRIDGE, et al., Respondents.**

**Civ. A. Nos. 87–1351, 87–1440 and 87–1472.**

United States District Court, District of Columbia.

June 15, 1987.

John A. Hodges, Frank Winston, Wiley, Rein & Fielding, Washington, D.C., for Federation of Japan Salmon Fisheries Co-op. Ass'n.

Paul Alexander, Alexander & Karshmer, Washington, D.C., Donald C. Mitchell, Anchorage, Alaska, for Kokechik Fishermen's Ass'n.

Howard Fox, Robert G. Dreher, Sierra Club Legal Defense Fund, Inc., Washington, D.C., Laurie J. Adams, Sierra Club Legal Defense Fund, Inc., Juneau, Alaska, for Center for Environmental Educ.

Secretary of Commerce, et al. Charles R. Shockey, Wildlife & Marine Resources Section, Land & Natural Resources Div., Dept. of Justice, Washington, D.C.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

These consolidated cases involve the validity of a May 14, 1987, final decision of respondent Secretary of Commerce ("Secretary"). That decision approved the application of the Federation of Japan Salmon Fisheries Cooperative Association ("the Federation" or "the Japanese Federation") for an incidental take permit under section 1374 of the Marine Mammal Protection Act, 16 U.S.C. §§ 1361–1406 (1972) ("MMPA"), and adopted regulations pursuant to section 1373 of the MMPA which authorize Federation members to take a total of 6,039 Dall's porpoise within the United States' 200 mile fishery conservation zone during the next three years. 50 C.F.R. 216.24(d)(5)(vii).

Presently before the Court are the motions of petitioners in each of the three cases for a preliminary injunction. Upon consideration of the supporting and opposing memoranda, oral argument of counsel, and the record submitted to the court to date, the motions of the petitioners in Kokechik Fishermen's Association, *et al.* and Center for Environmental Education, *et al.*, shall be granted. The motion of the Japanese Federation shall be denied as moot.

*Historical Background*

Kokechik alleges that Japanese fishing vessels began fishing for salmon with gillnets in Alaskan waters as early as 1904. By 1937, prompted by complaints from fishermen in the United States that Japanese gillnets were destroying Alaskan salmon stocks, the United States Senate passed a resolution that demanded that Japanese vessels stop salmon fishing off the coast of western Alaska. *See* 81 Cong. Rec. 2670, March 24, 1937. Although the

Japanese gillnet salmon fishery in the Bering Sea and North Pacific Ocean was suspended during the Second World War, at the urging of Senator Warren Magnuson, President Truman in 1945 executed a presidential proclamation authorizing the U.S. Government to establish conservation zones in the areas of the high seas contiguous to the coasts of the U.S. where fishing activities had been or in the future might be developed and maintained on a substantial scale. 59 Stat. 885 (Sept. 28, 1945). An explicit purpose of the proclamation was to "protect coastal fishery resources from destructive exploitation...." *Id.* The Truman proclamation was never implemented, however.

Between 1937 and 1952 Kokechik alleges that Japanese vessels fished extensively for salmon, including salmon of United States origin, in the Bering Sea and North Pacific Ocean and entrapped and drowned significant numbers of various marine mammals in their gillnets. *See* Kokechik Petition for Review at 8–9. The Federation denies that significant numbers of marine mammals or other animals were taken by the Japanese gillnet fishery prior to 1952 and denies that significant numbers of marine mammals or other animals were taken by the Japanese gillnet fishery between 1952 and 1976. *See* Answer of Federation at 3.

The International Convention for the High Seas Fisheries of the North Pacific Ocean, 4 U.S.T. 380, T.I.A.S. No. 2786 ("INPFC"), was signed by Canada, Japan, and the United States in 1952 and entered into force in 1953. The chief motivation behind the INPFC was the desire of the U.S. and Canada to minimize the interception of North American origin salmon by Japan's salmon fishery in the North Pacific and Bering Sea. This was accomplished by the initiation of the "abstention principle" under which Japan agreed to abstain from fishing for salmon east of longitude 175° West in the North Pacific Ocean and Bering Sea.

The Magnuson Fishery Conservation and Management Act of 1976 ("Magnuson Act") established a 200 mile fishery conservation zone ("FCZ" or now known as the Exclusive Economic Zone "EEZ") surrounding the coast of the U.S. Pursuant to the Magnuson Act, no foreign vessel, including vessels operated by Federation members, may fish within the zone for fish stocks that are fully utilized by U.S. fishermen. This Act directed the Secretary of State, in cooperation with the Secretary of Commerce, to initiate the renegotiation of any treaty pertaining to fishing within the FCZ and for certain other fishery resources beyond the FCZ, which were inconsistent with its provisions. As the 1952 INPFC was inconsistent in several respects with the Magnuson Act, it was determined necessary to renegotiate or terminate the INPFC.

On February 10, 1977, the U.S. gave notice of its intention to terminate the INPFC in one year unless it was renegotiated in that period. An agreement on a Protocol to the INPFC was signed by Canada, Japan, and the U.S. on April 25, 1978. This Protocol moved the abstention line to 175° East longitude, with the exception of a portion of the north central Bering Sea outside the U.S. FCZ. Additional areas where North American salmon and marine mammals are protected from fishing by Japan under the INPFC include approximately 775,000 square miles outside the U.S. FCZ. The Japanese mothership fleet, in return, is allowed to fish for salmon of primarily Asian origin in 70,000 square miles inside the U.S. FCZ between June 10 and July 31 of each year.

As part of the newly negotiated INPFC, all parties agreed to establish a program of coordinated scientific research as well as to establish procedures to facilitate observation of the mammal stock and fishing operations. Japan and the U.S. further agreed to a research program designed to reduce or eliminate the incidental take of marine mammals and assess the distribution, abundance, and status of Dall's porpoise taken incidentally in the high seas salmon fishery. The study included the biology, ecology, reproduction, food habits, and age structure of the mammals.

At the time the INPFC was renegotiated, the U.S. was aware that if Federation members were allowed to set their gillnets within the U.S. conservation zone, Dall's porpoise, fur seals, harbor porpoise, northern right whale dolphin, Pacific white-sided dolphin, common dolphin, sea lions, and other marine mammals would be entangled or drown in the nets set by the Japanese. For that reason, in 1978, the same year the Senate ratified the Protocol that amended the INPFC, the Congress amended the North Pacific Fisheries Act.

The North Pacific Fisheries Act of 1954, 16 U.S.C. § 1021 *et seq.* ("NPFA"), implemented the INPFC in the U.S. It was amended in 1978 to reflect the new Protocol and its Annex concerning the marine mammal research. At that time, in accordance with the North Pacific Fisheries Act and the INPFC, the Japanese fishery was exempted from the incidental take permit requirements of the MMPA for a period of three years, during which time the U.S. and Japan agreed to study the effect of the salmon fishery on marine mammal populations and to work to reduce or eliminate incidental takings. Section 14 of the NPFA stated: "After June 9, 1981, the taking of marine mammals incidental to fishing operations by Japanese vessels within the fishery conservation zone shall be regulated pursuant to the Marine Mammal Protection Act of 1972...." As the statutory waiver granted in the North Pacific Fisheries Act under which the Japanese operated was to expire in 1981, the Federation submitted an application for an incidental take permit under the Marine Mammal Protection Act on January 19, 1981. This application requested a general permit for three years (1981 to 1983).

*The Marine Mammal Protection Act*

Although the U.S. has allowed the Federation to enter the U.S. FCZ and set gillnets for salmon, its ability to do so is not uncon-ditional. The Federation and the Japanese government acknowledge that Federation members may not fish in the U.S. FCZ unless, while in the zone, they comply with the laws of the U.S. The MMPA is one of the laws Federation members must observe while fishing for salmon within the U.S. fishery conservation zone. It is that law which is at issue in this case.

Congress expressly found and stated in the MMPA that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities.... [S]uch species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population...." MMPA § 1361.[1]

Section 1371 of the MMPA imposes a moratorium on the "take" of all marine mammals in water subject to the jurisdiction of the U.S., including the Bering Sea and North Pacific Ocean. The term "take" is defined by the MMPA to mean "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." MMPA § 1362(12). A moratorium is defined as "a complete cessation of the taking of marine mammals...." MMPA § 1362(7). Defendant Secretary of Commerce has interpreted the term "harass" to include "the restraint or detention of a marine mammal, no matter how temporary." 50 C.F.R. § 216.3. Consequently, when a marine mammal entangles itself in a gillnet, even if the mammal manages to struggle free before it drowns, the Federation catcherboat captain who authorized the net to be set has committed a "taking" as the term is defined in the MMPA.

In recognition of the fact that marine mammals may frequently be taken in gill-

1. Pub.L. 95–426, Title VI § 602, Oct. 7, 1978, 92 Stat. 985 provided that: "It is the sense of the Congress that the President should convey to all countries having an interest in cetacean sea life the serious concern of the Congress regarding the continuing destruction of these marine mammals (highlighted by the recent slaughter of dolphins in the Sea of Japan by Japanese fishermen) and should encourage countries ..." to engage in discussions, exchange information, cooperate in establishing an international cetacean commission and adopt comprehensive marine mammal protection legislation.

nets set to take fish, section 1371(a)(1) of the MMPA authorizes the Secretary to waive the moratorium and allow marine mammals to be taken incidentally in the course of commercial fishing operations. Several statutory criteria must be met and findings made in order to assure the primary protection of marine mammal populations, which is guaranteed by the MMPA, before an incidental take permit may be issued. MMPA §§ 1371–75.

Regulations implementing the MMPA and establishing procedures by which the general moratorium on the taking of marine mammals in connection with commercial fishing operations may be waived, have been promulgated by the Secretary in 50 C.F.R. Part 216. These regulations establish the requirements which must be met before regulations waiving the moratorium may be promulgated and a marine mammal take permit may be issued, and they also establish the procedures which must be followed in the formal administrative hearing which must be held on any application for a marine mammal take permit. 50 C.F.R. Part 216, Subparts C and G. Permits may be granted if it is shown, on the basis of "the best scientific evidence available", that the taking will not be to the disadvantage of the stocks involved and will be consistent with the purposes and policies of the MMPA. MMPA § 1373(a). Section 1371 states: "In any event it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." MMPA § 1371(a)(2).

In 1981, after formal hearings before an Administrative Law Judge, the National Marine Fisheries Service (the delegate of the Secretary of Commerce with authority to grant permits under the MMPA) agreed with the ALJ's recommended decision to grant a three-year permit with annual quotas for 5,500 Dall's porpoise, 450 Northern fur seals, and 25 Northern sea lions. 46 Fed.Reg. 27056 (May 15, 1981).

An environmental group challenged the issuance of this permit in *Friends of Animals v. Baldridge*, No. 81–1547 (D.D.C. 1982). No temporary restraining order or preliminary relief was sought in that case; consequently, one year of fishing under the permit took place and a second was imminent, prior to the court's consideration of the merits. *Id.*, slip op. at 4. At issue was the meaning of the "best scientific evidence available" standard.

The court held that if the weight of authority suggests a certain figure is most likely, that figure should be adopted. *Id.* at 8. The court stated that "[a]lthough the Court does not necessarily approve of decisions, based as this one was, on a lack of data, the Court cannot say that the choice was unreasonable, especially when the choice was supported by the overwhelming weight of scientific opinion." *Id.* at 10–11. It was pointed out that the "pervasive lack of empirical data underlying the variables ... used in determining that the permit to take porpoise would not be to the disadvantage of the species is extremely troubling." *Id.* at 13.

In 1982, Congress, for a second time, amended the North Pacific Fisheries Act to extend the Federation's permit through June 9, 1987. MMPA § 1034(b). These amendments also require the Federation to assist as requested in meeting the objectives of the research program agreed to by the U.S. and Japan and to provide appropriate funding to carry out a joint research program on Dall's porpoises. In April 1986 the parties to the INPFC, after extensive negotiations, adopted new measures intended to reduce further the incidental take of U.S. origin salmon by Japanese high seas mothership and landbased fisheries. The measures provide for a phasing out of the Japanese mothership fleet from various specified portions of the Bering Sea over the next nine years. Changes are also made in the landbased fishery as well as in an intensification of research relating to the continent origin of salmon.

The Federation's MMPA permit, as extended by the North Pacific Fisheries Act, expired on June 9, 1987. The Federation,

on July 21, 1986, applied for a new permit authorizing its members to take 5,500 Dall's porpoise, 450 fur seals, and 25 sea lions during each of the next five years. 51 Fed.Reg. 9674 (August 16, 1986). No request was made to take harbor porpoise, common dolphin, and other marine mammals likely to be taken if Federation members are allowed to set their gillnets within the U.S. fishery conservation zone.

### The Method of Gillnet Fishing

If the challenged permit is upheld, on June 10, 1987, 129 catcherboats operated by Federation members will enter the waters of the U.S. fishery conservation zone in the area of the Bering Sea and North Pacific Ocean surrounding the western end of the Aleutian Islands off the coast of Alaska. Each night at dusk each catcherboat will set a nylon monofilament gillnet 9.3 miles long and 26 feet deep. A total of 1,200 miles of net length will be set. This fishery will set out and retrieve 129 of these over nine mile long gillnets every night of the approximately two month fishing season. In addition to catching immature salmon, the nets entangle Dall's porpoises and other marine mammals, including depleted populations of northern fur seals as well as sea birds, sea lions, harbor porpoise, northern right whale dolphin, and common dolphin, causing death or serious injury to many of the individual marine mammals. *See generally* National Marine Fisheries Service, U.S. Dept. of Commerce, Final Environmental Impact Statement and Economic Impact Analysis on the Incidental Take of Dall's Porpoise in the Japanese Salmon Fishery (May 1987) ("Final EIS").

Between June 10 and July 31, 1987, Federation members are authorized to set 9.3 miles of net as many as 6,020 times. Each time they do so, it is inevitable that some protected marine mammals will be entangled in the nets. Other than not setting their nets at all, there is nothing the captains and crews of Federation catcherboats can do to avoid entangling and drowning marine mammals and sea birds while fishing for salmon. *See* testimony of the Federation's expert witness, Horoshi Ogiwara,

an experienced fleet commander. *Kokechik* Brief at 11.

### Identity of the Parties

In the *Federation of Japan Salmon Fisheries v. Baldridge* case filed in this court on May 20, 1987, Civ. No. 87–1351, plaintiff sought review against respondents Secretary of Commerce and Undersecretary for Oceans and Atmosphere and to declare illegal, enjoin, and set aside certain actions of the respondents purportedly taken under the MMPA. On May 22, 1987, the Federation moved for expedited consideration of their petition, and on June 1, moved for a preliminary injunction. Petitioner is the Japanese Federation, a nonprofit cooperative association representing the Japanese high seas mothership salmon fishery. Respondents are the Secretary of Commerce, Malcolm Baldridge, the federal official charged with responsibility for granting, modifying, suspending, or revoking permits for fishing vessels under the MMPA, and Anthony Calio, the Undersecretary of Commerce for Oceans and Atmosphere, who is delegated authority by the Secretary to carry out the functions described by the MMPA.

In civil action number 87–1440, the Kokechik petitioners filed a complaint and motion for preliminary injunction on May 27, 1987, as a case related to the Federation case already filed with this Court. The Kokechik petitioners also sought review of the action taken by the Secretary of Commerce, in which a permit was issued and regulations adopted authorizing Federation members to take Dall's porpoise while fishing for salmon in the 200 mile U.S. fishery conservation zone, the same action challenged by the Federation in their case. Kokechik sought a declaratory judgment and preliminary and permanent injunction.

A third related case, *Center for Environmental Education v. Baldridge*, Civ. No. 87–1472, was filed with this Court one day after the Kokechik case, on May 28, 1987. Malcolm Baldridge, the Secretary of Commerce, Anthony Calio, the Undersecretary for Oceans and Atmosphere, William E. Evans, the Assistant Administrator for Fisheries, National Marine Fisheries Ser-

vice, the U.S. Department of Commerce, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service were named as defendants. All of the plaintiff organizations participated extensively in the administrative proceedings before the U.S. Department of Commerce relating to the Japan Federation's application for a marine mammal take permit for its gillnet salmon fishery, and all of them opposed the issuance of the permit by the Secretary. All allege that the issuance of the permit adversely affects their organizational interests, as well as the use and enjoyment by their members of the marine environment and the marine mammal and sea bird species affected by the issuance of the permit.

*The Administrative Proceedings*

Pursuant to the regulations implementing the MMPA, an ALJ conducted a formal hearing on the Federation's application in Seattle, Washington, in December 1986. The Kokechik Fishermen's Association, the Qaluyaat Fishermen's Association, all the petitioners in the CEE case, and the Japanese Federation participated as parties in the hearing. Subsequent to the formal administrative hearing, respondent NOAA on December 30, 1986, issued a proposed notice, pursuant to 50 C.F.R. Part 216, for the designation of the North Pacific fur seal—Pribilof Island Population, as "depleted" under the MMPA. MMPA § 1362(1). 51 Fed.Reg. 47156. A depleted population of marine mammals is one which has been determined to be below its optimum sustainable population. MMPA § 1362.

After consideration of over 3,500 pages of testimony, exhibits, and the receipt of extensive legal briefs, ALJ Hugh J. Dolan recommended on March 6, 1987, that a five (5) year permit be issued to the Japanese Federation that would allow 1,750 Dall's porpoise and 45 northern fur seals from the Commander Islands stock to be killed or seriously injured during 1987. For each of the four subsequent years, the ALJ recommended that the quota for Dall's porpoise be reduced by five per cent from the previous year. The ALJ also made findings and recommendations concerning permit terms and conditions and further research needs. Exceptions were filed to the recommended decision of the ALJ.

On May 28, 1987, James E. Douglas, Jr., the Acting Deputy Assistant Administrator for Fisheries, National Marine Fisheries Service, published the final decision of the Department of Commerce, as signed by Undersecretary Calio on May 14, 1987, in the Federal Register. 52 Fed.Reg. 19874 (May 28, 1987). That action amended 50 C.F.R. Part 216 to allow the Japanese Federation to take 6,039 Dall's porpoise in the next three years of which no more than 448 may be taken from the Bering Sea and no more than 2,494 may be taken from the North Pacific Ocean in any single calendar year. The ALJ's recommendation that the permit include fur seals was not adopted. Additionally, incidental take levels authorized by the subpart were reduced proportionately in the event that the Soviet Union reduced salmon quotas for 1988 or 1989 by more than 10 percent of the 1987 quota.

*The Challenges to the Secretary's Action*

The Japanese Federation:

The Federation claims that the quotas were based on an assumption that the fishing effort of the Federation in the FCZ will be reduced because of a reduction of the number of Federation vessels. It is asserted that based on the administrative record the decision to reduce the Dall's porpoise quotas to the levels of the permit is erroneous. The Federation also claims that despite the fact that the ALJ indicated that the Commander stock of Northern fur seals is above the lower boundary of OSP and thus could be taken, the Undersecretary ruled that there was not enough evidence to make such an OSP finding and that the denial of a permit for the taking of Commander stock fur seals is erroneous.

The Undersecretary also imposed a condition on the permit that to the extent the National Marine Fisheries Service is capable of placing U.S. marine mammal observers on vessels in the Japanese landbased salmon and high seas gillnet fleets, they must be readily accommodated. This decision is challenged as erroneous. These errors are alleged to be a violation of the

Administrative Procedure Act, 5 U.S.C. § 706(2), and it is alleged that they will cause irreparable injury to the Federation and its members.

The Kokechik Petitioners:

These petitioners make several claims. In sum, they assert that the Secretary knows, and it has been established in respondent's Final EIS, that fur seals will be entrapped in at least nine percent of the gillnet sets utilized by the Japanese Federation, some of which will be from the depleted Pribilof Island stock that respondent concedes is depleted. Despite the knowledge that approximately 541 fur seals and an undetermined number of harbor porpoise, northern right whale dolphin, Pacific white-sided dolphin, common dolphin, and sea lions will in fact inevitably be taken by the Federation in violation of the MMPA, petitioners allege that respondents have unlawfully refused to enforce the non-discretionary provisions of the MMPA. *See* MMPA § 1377.

Rather than informing the Federation that its members will not be allowed to set gillnets, and, in so doing violate the MMPA within the U.S. FCZ, the Secretary's decision expresses regret that catcherboat captains observed violating the MMPA may have to pay a fine: "Under these circumstances, where a negligible number of non-permitted takings will occur, and where the stock does not require the absolute protection provided by the MMPA, it is unfortunate that those who must pay the penalties will be determined largely by chance." 52 Fed.Reg. 19878 (May 28, 1987). The Secretary's decision then goes on to state that he "intends to seek amendment of the MMPA to permit incidental, but not intentional takings of small numbers of marine mammals, by vessels engaged in commercial fishing if such takings will have a negligible impact on the species and stock." *Id.* This proposed policy of the Secretary has been referred to by respondents as an "accidental take" policy.[2]

Petitioners claim that the Secretary has a mandatory duty under section 1377 of the MMPA which states "the Secretary shall enforce the provisions of this subchapter." MMPA § 1377(a). Petitioners' argument is that the Secretary's issuance of a permit for Dall's porpoise but not for other marine mammals he foreseeably knows will inevitably be taken along with the Dall's porpoise is a violation of that statutory mandate.

Petitioners also assert several other procedural claims with respect to the administrative process in this case. First, it is claimed that the Environmental Impact Statement failed to include all reasonable alternatives as is required by 42 U.S.C. § 4332(2)(C), in that the alternative of pursuing Congressional amendment of the MMPA, which the Secretary did twice in the past and has indicated in his decision he intends to do in this very case in the future, was not included in the EIS in violation of 42 U.S.C. § 4332(2)(E).

Second, petitioners allege that the Secretary has a duty to make a decision pursuant to the procedures set forth in 40 C.F.R. 1506.10 which prohibits the Secretary from making a final decision until 30 days after the publication of a notice in the Federal Register announcing that the EIS has been filed, unless a finding is made that it is in the best interest of the United States Government to waive the 30 day waiting period. Here, a decision was made without awaiting the required 30 days or obtaining the statutory waiver.

Lastly, it is alleged that pursuant to Section 1374(d)(3) of the MMPA, the Secretary may not issue a permit or adopt regulations authorizing takings of marine mammals unless the Secretary first determines that the best scientific evidence available was presented at the hearing held before the ALJ on the permit application. Petitioners assert that in this case the evidence was not the best scientific evidence available and that as a result the decision to issue

2. When questioned at oral argument about the propriety of such a policy in light of the clear import of the MMPA, counsel, in an apparent last minute change of position, asserted that "we are not trying to come under the rubric of the accidental take policy."

the permit was arbitrary and capricious and an abuse of discretion by the ALJ.

The CEE Petitioners:

The CEE petitioners allege that the Secretary failed to comply with the provisions of the MMPA in the decisionmaking process in this case in various respects: by the issuing of a marine mammal permit to the Japanese Federation that will allow the taking of Pribilof Island fur seals, a depleted species protected under the MMPA; by committing several major violations of the strict procedural requirements of the MMPA and the APA, which govern the conduct of this action; by failing to conduct the required formal administrative proceeding entirely on the record and without any *ex parte* communications, as the MMPA requires; and by failing to comply with the requirement of NEPA.

*Analysis*

Under this jurisdiction's long standing test in deciding whether to grant an injunction "the District Court should consider (1) the plaintiff's likelihood of prevailing on the merits, (2) the threat of irreparable injury to the plaintiff in the absence of injunctive relief, (3) the possibility of substantial harm to other interested parties from the injunctive relief, and (4) the interests of the public." *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 151 (D.C.Cir.1985) (citing *WMATC v. Holiday Tours,* 559 F.2d 841, 842–43 (D.C.Cir. 1977); *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958)). It is this test which must now be applied to the facts.

(1). Petitioners' likelihood of prevailing on the merits:

The petitioners assert different interests and have made different claims; thus, their likelihood of prevailing must be examined individually. Looking first at the Kokechik petitioners, the Court finds their claims to

be meritorious and that they have a substantial likelihood of success on the merits. It is, therefore, not necessary to reach the other claims asserted by the several different petitioners at this preliminary stage.

The full administrative record has not yet been filed with the Court; however, certain documents contained therein, such as the recommended decision of the ALJ, the Final Environmental Impact Statement, the notices published in the Federal Register, the final decision of the Secretary, and the affidavits of several parties (some of whom testified at the administrative hearing) are presently before the Court. This record is adequate to determine the proper interpretation of the MMPA and whether the MMPA has been properly interpreted by the Secretary.[3]

Returning to Kokechik's primary claim, our inquiry must focus on whether the Secretary's interpretation, as expressed in the regulation that grants the permit at issue to the Japanese Federation, is reasonable and consistent with the statutory language, legislative history, and purpose of the MMPA. "Our inquiry is informed by an awareness that the regulation is entitled to deference unless it can be said not to be a reasoned and supportable interpretation of the Act." *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 11, 100 S.Ct. 883, 890, 63 L.Ed. 2d 154 (1980). "In reviewing an agency's interpretation of a statute, a court should first examine the language of that statute to determine whether the interpretation falls within the statute's plain meaning." *General Motors Corp. v. Ruckelshaus,* 724 F.2d 979, 989 (D.C.Cir.1983). If the meaning of the statute is clear, "that is the end of the matter, for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Board of Governors of the Federal Reserve System v. Dimension Financial*

---

**3.** The claims which require the Court to review the administrative record to determine if it contained substantial evidence to uphold the Secretary's decision are Kokechik's claim relating to the use of the best scientific evidence at the administrative hearing, and the Federation's claim that the record does not contain substantial evidence to support the final decision made. Even with respect to those claims, which are founded in the APA and thus governed by the APA standard of review, the Court is able to resolve the issue of whether success on the merits is likely based on the present record and the argument of counsel.

*Corp.*, 474 U.S. 361, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986) (citation omitted).

■ The MMPA has been examined and interpreted by both the District Court and the Court of Appeals for the District of Columbia Circuit in *Committee for Humane Legislation, Inc. v. Richardson*, 414 F.Supp. 297 (1976), aff'd. 540 F.2d 1141 (1976). This Court is bound by and adopts that interpretation and its reasoning which will not be repeated at length here. It was, however, observed in *Richardson* that "[t]he primary purpose of the MMPA is to protect marine mammals; the Act was not intended as a 'balancing Act' between the interests of the fishing industry and the animals." *Richardson*, 414 F.Supp. at 306; *accord*, 540 F.2d at 1148. "The interests of the marine mammals come first under the statutory scheme, and the interests of the industry, important as they are, must be served only after protection of the animals is assured." 414 F.Supp. at 309.

■ Here, the Secretary has interpreted the MMPA so as to allow him to issue a permit to the Federation to take one species of mammal, Dall's porpoise, for which the required finding of no disadvantage based on optimum sustainable population has been made, even though the Secretary knows other species will also be taken and as to those other species no such finding has been made. In his decision the Secretary explains that under the circumstance where "a negligible number of nonpermitted takings will occur," a permit will be issued even though the statutory provisions to issue a permit for those species have not been met and and penalties will be imposed upon those who are caught taking the mammals. 52 Fed.Reg. 19878 (May 28, 1987). The decision does not define "negligible" in numerical terms nor in terms of stock population.

It is noted that "Congress foresaw the possibility that, in a given situation, there would be a lack of scientific information as to whether a proposed level of taking would be to the disadvantage of the marine mammals involved", *Richardson*, at 310, and that might result in an inability to find whether the stock was at its optimum sustainable population. " 'Before issuing any permit for the taking of a marine mammal, the Secretary must first have it proven to his satisfaction that *any* taking is consistent with the purposes and policies of the act—that is to say, that taking will not be to the disadvantage of the animals concerned. *If he cannot make that finding, he cannot issue a permit. It is that simple.*' " *Id.* (citing 118 Cong.Rec. 7686 (1972) (floor remarks)). This conclusion was found by the court to be supported elsewhere in the legislative history. *Id.*

In *Richardson*, the court also stated that Congress required in section 1371(a)(3)(A) and 1373(a) an explicit finding that a taking will not disadvantage the marine mammals involved prior to adopting such regulations because "only by knowing whether the population level would be reduced to a less-than-optimum level as a result of the taking could the agency determine whether such taking would be to the 'disadvantage' of the animals involved." *Id.* at 309–10. The Court of Appeals found that "the District Court had correctly interpreted the law as written." 540 F.2d at 1149.

The *Richardson* court cites a Marine Mammal Commission statement indicating that it could not find that "any number above zero" would satisfy the high burden required to be met to find no disadvantage to a particular stock. *Id.* 414 F.Supp. at 305. In this case, the permit issued appears to be invalid under the MMPA because a finding that all the marine mammals the Secretary knows will inevitably be taken are at or above their optimum sustainable population level has not been made. Importantly, one of the marine mammals involved, the Pribilof Island fur seal stock, has been found by the agency to be depleted[4]. It is, by statutory definition,

---

4. "Depleted" is defined in the MMPA as "any case in which (A) the Secretary ... determines that a species or population stock is below its optimum sustainable population; (B) a State ... determines that such species or stock is below its optimum sustainable population; or (C) a species or population stock is listed as an endangered species or a threatened species under the Endangered Species Act of 1973 [16 U.S.C. 1531 et seq.]." MMPA § 1362(1).

impossible for a Pribilof fur seal to be taken without disadvantaging the stock. Under the plain language of the MMPA and in accordance with the interpretation of the MMPA as stated in *Richardson,* the Secretary is not given discretion to determine that a taking will not disadvantage a stock unless the specifically required statutory finding regarding optimum sustainable population has been made. Congress has clearly made the determination as to when a stock will or will not be considered disadvantaged.

The MMPA imposes an absolute moratorium on all takings of marine mammals. The only way this moratorium may lawfully be ignored is through explicit Congressional action, as has been done for the Federation twice in the past, or by meeting the burden of proof[5] necessary to allow the agency to find that a single taking will not disadvantage a particular stock because that stock is within the range of its optimum sustainable population. For the Secretary to issue a permit for only the Dall's porpoise, when it is clear that other marine mammals are certain to be taken[6] yet no permit was issued for such mammals because a finding could not be or was not made, appears, at this juncture, clearly contrary to the MMPA.

The Secretary argues that "even though a small number of marine mammals not authorized by a permit may be taken incidental to the salmon fishing, that fact does not preclude the issuance of a permit for other species." Respondent's Brief at 19. Contrary to that argument, it appears that if it is known by the Secretary that any mammals will be taken and there has been no finding that such mammal stock is within its optimum sustainable population no permit may be issued. Moreover, exactly what number of takings would constitute a "small number" is never identified by the respondents. This *"de minimus"* interpretation appears inconsistent with the plain meaning of the provisions of the MMPA.

Congress has enacted a statute which does not recognize a *de minimus* taking and does not delegate to the Secretary authority to exercise discretion with regard to whether a taking is or is not *de minimus* or will or will not disadvantage a stock which is not at its optimum sustainable population. The standard which must be met before a taking is allowed is clearly spelled out in the MMPA and is mandatory.

▉ The Secretary also indicates "his intent to enforce the taking provision through the civil penalty sanctions that Congress authorized in section 105 of the MMPA", and argues that "[t]he Under Secretary may exercise his discretion regarding the specific enforcement action to be instituted against anyone who takes marine mammals without a permit." Respondent's Brief at 19. Section 1377 of the MMPA, the enforcement provision of the statute, clearly states "the Secretary shall enforce the provisions of this subchapter." MMPA § 1377(a). The statutory duty of the Secretary is thus mandatory, not discretionary. To allow the Secretary to enforce the MMPA at his discretion by way of civil penalty in the case of unlawful takings, of which the Secretary had reason to expect, would result in rendering the strict requirements of obtaining a permit under the MMPA meaningless. It would allow the violator to, in effect, purchase the right to violate a mandatory prohibition and allow the agency to engage in the sort of "fine utilitarian calculations" regarding the value of an endangered species the Court found unacceptable in *TVA v. Hill,* 437 U.S. 153, 187, 98 S.Ct. 2279, 2298, 57 L.Ed. 2d 117 (1977) and which under the MMPA have been precluded by Congress.

If the Secretary believes that a change of policy is essential to properly enforce the MMPA, the appropriate forum to initiate a change is in Congress, as the Secretary indicated in his final decision he in fact

---

5. The burden of proof with regard to showing that the taking will not disadvantage the species or stock is "by no means a light burden". *Id.* at 303.

6. There is evidence based on the Federation's history of fishing in this area that these mammals have been taken in the past; thus, there is no reason to expect that they will not continue to be taken.

plans to do. He is not free, however, to implement that change by adopting an interpretation of the MMPA which conflicts with the language and intent of the statute. Nor is it for this Court to institute such a change in light of clear statutory purpose and mandate to do otherwise.

The Court need not consider the Federation's motion for preliminary injunction at this time since its decision on the Kokechik claims effectively renders the Federation's claims moot.

(2). The threat of irreparable injury to the plaintiff in the absence of injunctive relief:

■ The Kokechik petitioners claim that harbor porpoise, northern right whale dolphin, Pacific white-sided dolphin, common dolphin, sea lions, and other marine mammals will be taken in the fishery and that these takings will irreparably harm the stocks of those species. The CEE petitioners also allege irreparable injury to various marine mammal populations, including the depleted Pribilof Island fur seal. As was asserted by the Kokechik petitioners, the CEE petitioners also claim that, once marine mammal populations are harmed, the damage cannot be undone or compensated for. The MMPA requires the agency to act as a trustee for these mammals and protect their interests. Unless a preliminary injunction is granted and the fishing permit rescinded so that the mandate of the MMPA may be properly carried out, irreparable harm will be done to the enumerated mammal populations.

Instruction is given by the Supreme Court in *Amoco Production Co. v. Gambell*, — U.S. —, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) which states "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.[7] If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* 107 S.Ct. at 1404.

(3). The possibility of substantial harm to other interested parties from the injunctive relief and (4). The public interest:

Respondents argue that the issuance of a preliminary injunction will harm the United States should Japan choose to dishonor the INPFC and a destabilization of the international conservation regime result. This potential for harm, however, may be alleviated, should it occur, if Congress were to waive the requirements of the MMPA as to the Japanese Federation for this season as it has done for the past six years. Moreover, the likelihood of harm is speculative.

The harm the Japanese Federation alleges will result from the issuance of a preliminary injunction appears to be strictly economic. The Federation will be unable to continue gillnet fishing operations within the FCZ pending further administrative or Congressional action.

When the irreparable harm to the marine mammal populations which will occur, if an injunction is not granted, is balanced against the harms alleged by respondent and the Federation, the interests of the marine mammal populations at stake in this case outweigh those of the other interested parties. This is especially apparent when the public interest in protecting the environment is considered. While this Court recognizes that " 'a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law,' " *Amoco*, at 1402, on these facts, unlike the facts of *Amoco*, after balancing the competing interests involved, the Court

---

7. At issue in *Amoco* were the exploration activites of the defendant oil company occurring in Alaska which were alleged to violate a Federal statute providing protection for natural resources used for subsistence in Alaska. The district court declined to issue a preliminary injunction and the Supreme Court upheld that decision, after balancing the competing public interests involved, based on the finding that "[t]here, however, injury to subsistence resources ... was not at all probable." *Id.* It was also found by the district court that the public interest favored the continued oil exploration and such exploration in this case would not cause the type of harm, a restriction in subsistence uses or resources, that "that [Federal statute] was designed to prevent." *Id.*

concludes that the purpose of the MMPA—to restore, maintain, and protect the integrity of the marine mammal populations—*would* be undermined by allowing the statutory violation to continue.

Unlike *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982),[8] here it is certain that unlawful takings of marine mammals will occur if the permit issued to the Japanese Federation is allowed to stand. Congress has already determined that such takings are harmful to the environment and this Court has no basis on which to invalidate that determination. Furthermore, here, unlike the *Amoco* case, the public interest does not lie in protecting the economic well-being of the Federation fishermen, but, as clearly required by the MMPA, in carrying out Congress' will in protecting the marine mammals and maintaining the health and stability of the marine ecosystem.

### ORDER

Upon consideration of the motions for a preliminary injunction, the legal memoranda and exhibits, the argument of counsel, and consistent with the accompanying Memorandum Opinion, it is this 12th day of June, 1987,

ORDERED that the motion of the Federation be, and hereby is, denied as moot; it is further

ORDERED that the motions of petitioners Kokechik and the Center for Environmental Education be, and hereby are, granted; it is further

ORDERED that Respondents be, and hereby are, preliminarily enjoined from granting a permit to the Federation of Japan Salmon Fisheries Cooperative Association in the United States Exclusive Economic Zone; and it is further

ORDERED that this preliminary injunction shall not issue until appropriate bond is posted. Counsel are invited to submit

**8.** In *Romero–Barcelo* the District Court found that defendant's violations of the environmental statute at issue did not cause any "appreciable

recommendations as to the appropriate bond not later than noon on June 19, 1987.

harm to the environment." *Id.* at 310, 102 S.Ct. at 1802.