**KOKECHIK FISHERMEN'S ASSOCIATION, et al.**

v.

**SECRETARY OF COMMERCE, et al.**

Appeal of FEDERATION of JAPAN SALMON FISHERIES COOPERATIVE ASSOCIATION.

Nos. 87–5239 to 87–5243, 87–5248, 87–5249.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 3, 1987.

Decided Feb. 16, 1988.

796

Anne S. Almy, Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. Gen. and Edward J. Shawaker, Dept. of Justice, Washington, D.C., were on the brief for appellants, the Federal Government, in Nos. 87–5239, 87–5248 and 87–5249. Elizabeth Ann Peterson, Dept. of Justice, Washington, D.C., also entered an appearance for appellants, Federal Government.

John A. Hodges, Washington, D.C., for appellant, Federation of Japan Salmon Fisheries Co-op. Ass'n, in Nos. 87–5239, 87–5240, 87–5241, 87–5242 and 87–5243.

Donald C. Mitchell, Anchorage, Alaska, for appellees, Kokechik Fishermen's Association, et al., in Nos. 87–5239, 87–5248 and 87–5249.

Laurie J. Adams, for appellees, Center for Environmental Educ., et al., in Nos. 87–5239, 87–5240, 87–5241, 87–5242 and 87–5243. Howard Fox, Washington, D.C., also entered an appearance for appellees, Center for Environmental Educ., et al.

Before GINSBURG and STARR, Circuit Judges, and GESELL [*], District Judge.

Opinion for the Court filed by District Judge GESELL.

Dissenting opinion filed by Circuit Judge STARR.

GESELL, District Judge:

This case requires us to examine an aspect of this nation's announced policy to protect, in waters under its jurisdiction, marine mammal populations that are in danger of depletion or extinction.

Following formal rulemaking proceedings, the Secretary of Commerce issued a regulation[1] pursuant to the Marine Mammal Protection Act of 1972 ("MMPA"), 16 U.S.C. §§ 1361–1407 (1982 & Supp. III 1985), authorizing a group of Japanese

---

[*] Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Regulations Governing the Taking and Importing of Marine Mammals, 52 Fed.Reg. 19,874 (1987).

commercial fishermen known as the Federation of Japan Salmon Fisheries Cooperative Association ("Federation") to take a fixed number of Dall's porpoise incidental to commercial fishing for salmon in U.S. conservation waters. The permit application was opposed at the administrative level by environmentalists, the Center for Environmental Education, *et al.* ("CEE") and by a group of Alaskan commercial fishermen, Kokechik Fishermen's Association, *et al.* ("Kokechik"). As finally authorized on May 22, 1987 after several amendments, the permit failed to meet objections advanced during the rulemaking process by Kokechik and CEE, on one side, and the Federation on the other side.

Shortly after the Secretary's final decision, the Federation, Kokechik and CEE filed petitions for review of the permit in the U.S. District Court for the District of Columbia, as authorized by the statute. 16 U.S.C. § 1374(d)(6). On June 10, 1987, the three cases were consolidated by the District Court and a hearing held on the motions for preliminary injunction filed by the three parties. After careful consideration, the District Court granted the motions of petitioners Kokechik and CEE on June 15, 1987, and thus preliminarily enjoined the Secretary of Commerce from issuing a permit to the Federation; the Federation's motion was thereupon dismissed as moot. *Kokechik Fisherman's Ass'n, et al. v. Malcolm Baldrige, et al.,* 679 F.Supp. 37 (D.D.C.1987). Appellants Federation and Secretary of Commerce then filed a notice of appeal in this Court on June 25, 1987.

Because a question of pure statutory interpretation controls our review of the District Court's order, and its final resolution is essential, we turn immediately to this decisive issue. *See NRDC v. Morton,* 458 F.2d 827, 832 (D.C.Cir.1972). Perceiving the issue as the District Court preliminarily suggested it should be decided, we affirm and remand to the District Court only for such further proceedings consistent with this decision as may be required.

## BACKGROUND

In 1952, the United States, Japan and Canada signed the International Convention for the High Seas Fisheries of the North Pacific Ocean ("INPFC"). 4 U.S.T. 380, T.I.A.S. No. 2786. Under this treaty, Japan agreed to refrain from fishing for salmon in certain areas of the North Pacific Ocean and in the Bering Sea. In 1978, the INPFC was renegotiated to bring the treaty in conformity with the recent adoption by the United States of a 200 mile Fisheries Conservation Zone, now known as the Exclusive Enterprise Zone ("EEZ"). 30 U.S.T. 1095, T.I.A.S. No. 9242. The protocol amending the treaty permitted the Japanese to fish for salmon inside the U.S. EEZ. *Id.* The North Pacific Fisheries Act of 1954 ("NPFA"), implementing the INPFC, was also amended in 1978 and exempted Japanese commercial salmon fishing from the strictures of the MMPA until June 9, 1981. 16 U.S.C. § 1034(b) (1976 & Supp. II 1978). The NPFA further provided that after June 9, 1981 the restrictions of the MMPA would apply with full force and effect to Japanese salmon fishing within the EEZ. *Id.* § 1034(c).

In 1981, the National Oceanic and Atmospheric Administration ("NOAA"), acting pursuant to section 1374 of the MMPA, issued the Federation a three year general permit allowing its members an annual take of 5,500 Dall's porpoise, 450 northern fur seals, and 25 northern sea lions incidental to their commercial salmon fishing. Takings of Marine Mammals Incidental to Commercial Fishing Operations, 46 Fed. Reg. 27,056 (1981). Congress then extended this permit in 1982 by amendments to the North Pacific Fisheries Act on the condition that further research be performed examining ways to reduce or avoid incidental takings of marine mammals during salmon gillnet fishing. 16 U.S.C. § 1034(b) (1982). The permit was scheduled to expire on June 9, 1987 and without either Congressional extension of the permit or the issuance of a new general permit, the Federation's commercial salmon fishing within the U.S. EEZ would effectively cease at that time.

On July 21, 1986, the National Marine Fisheries Service ("NMFS"), a division of

NOAA, received an application from the Federation for a five year general permit under the MMPA which essentially sought an extension of the previous permit's terms through June 9, 1992. As required by the MMPA, NMFS/NOAA published in the *Federal Register* a notice of receipt of the application, the proposed regulation based on the application and the scheduling of formal rulemaking hearings, along with the procedures to be used and issues to be examined at the hearings. Regulations Governing the Taking and Importing of Marine Mammals, 51 Fed.Reg. 29,674 (1986). In addition, included in the notice were statements required under section 103(d) of the MMPA concerning the status of each marine mammal stock affected and the effects of any permitted taking on its optimum sustainable population ("OSP").[2] 16 U.S.C. § 1373(d). A Draft Environmental Impact Statement was also issued shortly thereafter by the Environmental Protection Agency. No statements were published relating to northern sea lions because only one had been reported taken since the general permit was issued in 1981 and the NMFS considered the probability of other incidental takings too remote to warrant its concern. In addition, it was noted that northern fur seals from the Pribilof Islands could not be included in the proposed permit regulation because of a separate agency action to list the stock as depleted, thereby precluding issuance of a taking permit under the MMPA.[3] Thus, the proposed regulation dealt solely with the incidental taking of Dall's porpoise.[4]

On December 1–7, 1986, a formal rulemaking hearing on the permit request and proposed regulation was held before an Administrative Law Judge ("ALJ") of the United States Department of Commerce. After careful consideration of a voluminous record, the ALJ recommended issuance of a five year permit to the Federation allowing the incidental taking of 1,750 Dall's porpoise during 1987 with a 5% yearly reduction over the following four years, and 45 northern fur seals annually.[5] The decision to recommend the inclusion of northern fur seals was arrived at during the course of rulemaking when it was learned that the Federation was seeking permission to take northern fur seals from the Commander Island stock, not from the Pribilof Island stock which was thought to be depleted.[6] The ALJ also noted that sea lions, harbor porpoise, Pacific white-sided dolphin, northern right whale dolphin, and killer whales are incidentally, although infrequently, taken during salmon gillnet fishing and that the Federation had applied in its permit for the taking of northern sea lions. The ALJ concluded that since there was virtually no scientific data on the record concerning these species, either because the Federation had not applied for such takings in its permit or the NMFS had not included them in the Federal Register notice,[7] the Federation was prohibited from taking these spe-

2. The term "optimum sustainable population", as defined in 50 C.F.R. § 216.3 (1986), means "a population size which falls within a range from the population level of a given species or stock which is the largest supportable within the ecosystem to the population level that results in maximum net productivity."

3. The NMFS proposed to designate the Pribilof Island population of North Pacific fur seals as depleted under the MMPA on December 22, 1986. North Pacific Fur Seal—Pribilof Island Population; Designation as Depleted, 51 Fed. Reg. 47,156 (1986).

4. The initial proposed rule would have permitted the annual incidental taking of 5,500 Dall's porpoise. 51 Fed.Reg. 29,674, 29,675 (1986).

5. Subsequent to the ALJ's recommendations, the NMFS published a notice of amendment to the proposed rule which would have permitted the Federation to take annually up to 450 northern fur seals incidental to commercial fishing. Regulations Governing the Taking and Importing of Marine Mammals, 52 Fed.Reg. 2,566 (1987).

6. At the time the application was received and the initial proposed regulation noticed, the NMFS believed that the permit sought permission to take northern fur seals from the Pribilof Island stock, not from the Commander Island stock. 51 Fed.Reg. at 29,676.

7. Although the Federation requested a taking quota for northern sea lions, the original proposed rule did not include this species because the NMFS believed that the probability of incidental taking of northern sea lions was too remote to warrant consideration. *Id.*

cies.[8] In addition, the ALJ made findings and recommendations relating to the terms and conditions attaching to the permit and further research needs.

Pursuant to rulemaking procedures, the Secretary then reviewed the record developed during the formal hearings, the ALJ's recommended decision, the exceptions filed thereto, and the Final Environmental Impact Statement, and issued a final decision. The final rule provided for a general permit to be issued under the MMPA to the Federation allowing "an aggregate taking during the three year permit period of no more than 789 Dall's porpoise in the Bering Sea and 5,250 in the North Pacific Ocean, of which no more than 448 may be taken in the Bering Sea and no more than 2,494 may be taken from the North Pacific Ocean in any single calendar year." Regulations Governing the Taking and Importing of Marine Mammals, 52 Fed.Reg. 19,874 (1987). With regard to the northern fur seals, the Secretary determined that an incidental take permit could not be issued under the MMPA because insufficient information existed on the record to ascertain whether the Commander Island population was at the minimum level of its optimum sustainable population. *Id.* at 19,-875. Further, he ruled that the "incidental taking of northern fur seals, like the taking of northern (Steller) sea lions, harbor porpoise, Pacific white-sided dolphin, northern right whale dolphin, and killer whales is prohibited by the Marine Mammal Protection Act." *Id.* at 19,878.[9]

## ANALYSIS

The Federation's commercial salmon fishing in the U.S. EEZ is conducted with the use of gillnets. Gillnet fishing involves setting out nylon nets approximately nine miles long and 26 feet deep at dusk using small fleets of motor boats. The nets drift freely near the surface where salmon and marine mammals, primarily Dall's porpoise, feed during the night. These fish and mammals become ensnared in the drifting nets. The next morning motor boats retrieve the nets and haul in whatever catch has been ensnared in the nets.

As is readily apparent, this method of fishing does not permit discrimination between which species of fish and mammals will be ensnared and which will not. Consequently, although the Federation actively seeks to catch only salmon, marine mammals protected by the MMPA end up as unintentional victims of salmon gillnet fishing because of the nature of the fishing gear and techniques used. This result is absolutely prohibited by the MMPA unless, pursuant to the requirements of the Act, the Secretary of Commerce specifically grants permission for the taking of marine mammals incidental to commercial fishing.[10] 16 U.S.C. § 1371(a)(2).

The permit at issue here grants the Federation permission to take a specified quota of Dall's porpoise incidental to commercial gillnet salmon fishing. No other marine

---

8. The Secretary in his 1981 final decision authorizing the issuance of a permit to the Federation ruled that "[t]he permit and regulations allow no takings of harbor porpoises, Pacific white sided dolphin or killer whale. Takings of these marine mammals are in violation of and subject to prosecution under the MPA." 46 Fed.Reg. 27,056, 27,058 (1981). That permit, however, did allow for the annual taking of 25 northern sea lions.

9. The Secretary believed that the Federation was trapped in unfortunate circumstances by the strictures of the MMPA. After reviewing the record, he felt that only a negligible number of mammals, in terms of impact on the species and stocks, not covered by the permit would be incidentally taken and that some of these mammal stocks did not "require the absolute protection provided by the MMPA." 52 Fed.Reg. at

19,878. Therefore, the Secretary felt that civil penalties in these circumstances served no useful purpose and intended to "seek amendment of the MMPA to permit incidental, but not intentional, takings of small numbers of marine mammals, by vessels engaged in commercial fishing, if such takings will have a negligible impact on the species and stocks." *Id.* This type of exemption for incidental, but not intentional, takings having a negligible impact on the species involved is currently limited to citizens of the United States. *See* 16 U.S.C. § 1371(a)(4)(A).

10. The Secretary defines the term "incidental catch" to include the taking of a marine mammal "as a consequence of the steps used to secure the fish in connection with commercial fishing operations" 50 C.F.R. § 216.3 (1986).

mammal species are included within the permit. Although Dall's porpoise is the protected marine mammal primarily affected by the Federation's fishing, it is foreseeable that takes of northern fur seals, northern sea lions, harbor porpoises, Pacific white-sided dolphins and killer whales will occur. Since the taking of any of these other marine mammals without a permit is absolutely prohibited by the MMPA, the legitimacy of the permit issued here comes under scrutiny. The MMPA must be analyzed to determine whether the Secretary of Commerce may legally issue a permit allowing incidental taking of one protected marine mammal species knowing that other protected marine mammal species will be taken as well.

Congress, by enacting the MMPA, put into effect a moratorium on the taking of marine mammals. The term "moratorium" is defined by the Act to mean "a *complete cessation* of the taking of marine mammals...." 16 U.S.C. § 1362(7) (emphasis added).[11] Since June 9, 1981, this moratorium has applied to Japanese commercial fishing in the U.S. EEZ. Section 1377 of the MMPA requires the Secretary of Commerce to enforce the provisions of the Act and implementing regulations promulgated thereunder.

Under a limited exception to this moratorium, the taking of marine mammals incidental to commercial fishing operations may be allowed. 16 U.S.C. § 1371(a)(2). Before such a permissible taking can occur under this exception, two statutory requirements must be met: the taking must be authorized by regulations promulgated through formal rulemaking proceedings and a permit issued by the Secretary of Commerce; the taking must meet the requirements of the MMPA and be consistent with the primary goal of protecting marine mammals. *See id.*

Under the MMPA, before a permit authorizing a taking may be issued, the Secretary "must be assured that the taking ... is in accordance with sound principles of resource protection and conservation as provided in the purposes and policies of this chapter...." 16 U.S.C. § 1371(a)(3)(A). The guiding principles of resource protection and conservation are set out in 16 U.S.C. §§ 1361(2) and 1361(6). Section 1361(2) provides:

[Marine mammal] species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population....

Section 1361(6) reads in relevant part as follows:

[I]t is the sense of Congress that [marine mammals] should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem. Whenever consistent with this primary objective, it should be the goal to obtain an optimum sustainable population keeping in mind the carrying capacity of the habitat.

Thus, it is clear that "[t]he Act was to be administered for the benefit of the protected species rather than for the benefit of commercial exploitation." *Committee for Humane Legislation, Inc. v. Richardson*, 540 F.2d 1141, 1148 (D.C.Cir.1976).

Consonant with these principles, the MMPA provides a scheme to determine the *number* and *kind* of marine mammals which can be taken incidental to commercial fishing operations. Under this scheme, the Secretary is obligated to determine that the permit applicant has carried its burden of proving that the taking sought does not disadvantage the species involved and is consistent with the policies and purposes of the Act. The Secretary, thus, must first

---

11. In turn, the Act defines "take" to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(12). The Secretary fur- ther interprets the term "harass" to include "the restraint or detention of a marine mammal, no matter how temporary." 50 C.F.R. § 216.3 (1986).

determine that the requested taking will not be to the disadvantage of the affected species and population stocks. 16 U.S.C. § 1373(a). Pursuant to this determination and in conjunction with the formal rule-making proceedings, the Secretary must publish statements on population levels and the expected impact of the proposed regulations on the optimum sustainable population of the affected marine mammal species. 16 U.S.C. § 1373(d). Any decision the Secretary makes must be consistent with the MMPA "immediate goal" that

> the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishery operations be reduced to insignificant levels approaching zero mortality and serious injury rate....

16 U.S.C. § 1371(a)(2).

While the Act may not prohibit issuance of a permit where there is only a very remote possibility that marine mammals for which an optimum sustainable population has not been determined may be taken incidental to commercial fishing, such a situation is clearly not the case here. In its original permit application the Federation requested that 450 fur seals be allowed to be taken annually incidental to commercial salmon fishing in the U.S. EEZ.[12] Although there were indications the taking might be less, it is readily apparent that the taking of these marine mammals is not merely a remote possibility but a certainty.[13]

In his final decision, the Secretary concluded that it was not possible to make the required finding that the northern fur seal population from the Commander Island stock is within its optimum sustainable population level. The Secretary found the evidence unclear and that a "significant dispute" existed as to whether it was above the minimum level of its optimum sustainable population. It could not be determined, therefore, that this protected stock would not be disadvantaged by takings incidental to the Federation's fishing operations in the U.S. EEZ. As to the Pribilof Island population, the Secretary found it was depleted. Thus, in neither case could findings which are an absolute requirement for the issuance of a permit and waiver of the MMPA be made.[14] Yet the Secretary, despite his inability to determine whether and to what extent northern fur seals would be disadvantaged by the Federation's fishing operations, issued the permit taking the position that as long as it did not authorize the taking of northern fur seals he had complied with the MMPA. The result was, in effect, that the permit allowed the Federation to take protected marine mammals for a price—the civil penalties imposed for such takings.

■ This is a result that the MMPA does not countenance. The MMPA effects a moratorium on the taking of marine mammals. Congress decided to undertake this decisive action because it was greatly concerned about the maintenance of healthy populations of all species of marine mammals within the ecosystems they inhabit. Exceptions to this moratorium clearly evidence a concern with the relationship between the activity engaged in and its effect on marine mammals and their ecosystem.

---

12. NMFS's regulations require that all applications for a general permit to take marine mammals incidental to commercial fishing operations include:

> A statement identifying the marine mammals and numbers of marine mammals which are *expected* to be taken under the general permit.

50 C.F.R. § 216.24 (emphasis added).

13. When he granted the permit to the Federation the Secretary was informed and knew that species of marine mammals other than Dall's porpoise, a species at the OSP level, would inevitably be taken incidental to the Federation's salmon fishing operations. These included northern fur seals from the Pribilof Island stock, a depleted species protected under the MMPA, as well as other species as to which no OSP finding one way or the other had been made—northern fur seals from the Commander Island stock, harbor porpoise, northern right whole dolphin, Pacific white-sided dolphin, and other dolphin, as well as various sea lions.

14. It is necessary to know the OSP in order to determine whether or not an activity will "disadvantage" the marine mammals involved. Therefore, Congress required the Secretary to act only on the basis of the very knowledge which he admits is unknown: the effect of any proposed taking on optimum sustainable population levels.

It is the duty of the Secretary to take a systemic view of an activity's effect on marine mammals. A view that the permit process functions merely to determine which takes will be exempted from civil penalties is inconsistent with this duty because it allows—subject to the civil penalty price—illegal takings of other protected marine mammals.

■ The Secretary has no authority, by regulation or any other action, to issue a permit that allows conduct prohibited by that Act. Nonetheless, the Secretary chose to disregard these incidental takings as "negligible," an undefined and ambiguous standard at best. The MMPA, however, does not provide for a "negligible impact" exception to its permitting requirements where incidental takings are not merely a remote possibility but a certainty.

■ As enacted, section 1371(a)(4) creates a narrow exception for incidental, but not intentional, takings having a negligible impact on the species involved "by citizens of the United States while engaging in commercial fishing operations, . . . ." The Secretary is not authorized to extend this flexibility to the Japanese nor is he authorized to create a new undefined statutory exception under the heading of "negligible," which clearly has the effect of avoiding the strictures of the MMPA and congressional intent. Practical considerations or unavailability of information is no excuse. If the Secretary believes the Act needs amendment, then it is Congress he must address. The horse must stay ahead of the cart.

Furthermore, Congress has provided one statutory relaxation of the MMPA's otherwise strict moratorium on takings except as authorized in section 1371(a). Section 1371(a)(2) was amended in 1981 to read:

In any event it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero serious injury and mortality rate; provided that this goal shall be satisfied in the case of the incidental taking of marine mammals in the course of seine fishing for yellowfin tuna by a continuation of the application of the best marine mammal safety techniques and equipment that are economically and technologically practicable.

No similar language was included in the 1982 amendment of section 1034, which reauthorized the Federation permit for 1984–87. It thus appears that Congress did not intend to loosen MMPA requirements in order to accommodate Federation needs, as it did for the tuna industry.

The MMPA does not allow for a Solomonic balancing of the animals' and fisheries' interests such as the Secretary attempted.[15] The interest in maintaining healthy populations of marine mammals comes first and the Secretary cannot ignore the fur seals. He can include the northern fur seals in the permit only if he makes the requisite findings. Lacking such findings the permit cannot issue. Moreover, he may not allow the Federation merely to pay a price for taking protected marine mammals; and he must face up to the taking of other marine mammals the record shows will also inevitably occur if gillnet fishing is permitted.

## CONCLUSION

Thus, we hold that the permit, as granted to the Federation, is contrary to the requirements of the MMPA in that it allowed incidental taking of various species of protected marine mammals without first ascertaining as to each such species whether or not the population of that species was at the OSP level. If it is appropriate to grant foreign commercial fishermen some leeway to take marine mammals incidentally in carrying out their commercial fishing operations for salmon, it is for the Congress, not the Secretary to decide. Past administrative practice that is inconsistent

---

**15.** In *Committee for Humane Legislation, Inc. v. Richardson,* this Court stated that the "[b]alancing of interests . . . is entirely a legislative decision, dictated at present by the terms of the Act." 540 F.2d at 1151 n. 39. Thus, the Secretary's concern for potential harm to Japanese commercial fishing or our system of international treaties should be addressed to Congress.

with the purpose of an act of Congress cannot provide an exception and the moratorium must still be fully upheld in this situation. *See FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981).

Affirmed and remanded for further proceedings consistent with this decision.

STARR: Circuit Judge, dissenting:

This case arises out of the faraway, frigid waters of the Bering Sea. There, fish abound in waters where interests of the United States, the Soviet Union, and Japan coincide and, at times, conflict. Not only are the great commercial fishing powers present, with motherships and fleets of catcher boats plying their trade; also present are creatures, some based on land, some at sea, known as marine mammals. Marine mammals, like mother ships and catcher boats, fish for their living as well. And in the robust waters of the North country, commercial fishing nets and marine mammals at times, indeed inevitably, come into contact. The issue before us concerns the welfare of marine mammals caught up, quite literally, in the nets of ships of commerce and trade.

Notwithstanding the unusual setting of this case, the question presented to us is the workaday one of statutory construction. In rejecting the common-sense reading of the statute adopted by the agency charged with administering it, the court reaches a result that, in my judgment, Congress never contemplated. In my view, today's decision is unsupported by the text, structure, or legislative history of the statute. I therefore respectfully dissent.

### I

Under now-familiar principles, the task before us in construing a statute administered by an agency of the Executive Branch is clear. First, if Congress has addressed the precise issue in question, and the intent of Congress is clear, it is the judiciary's duty to give effect to that Congressional determination. *See NLRB v.*

*United Food and Commercial Workers Union,* —— U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 106 S.Ct. 2860, 2867, 92 L.Ed.2d 166 (1986); *Chevron, U.S.A. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If, on the other hand, the statute is silent or ambiguous with respect to the inquiry at issue, we are obliged under settled principles of law to defer to the agency's construction, if reasonable, of that statute. *United Food,* 108 S.Ct. at 421; *Japan Whaling Ass'n,* 106 S.Ct. at 2868; *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782.

It is abundantly clear that Congress did not speak in so many words to the precise issue that the court decides today: whether the National Oceanic and Atmospheric Administration ("NOAA"), which is charged with administering the Marine Mammal Protection Act, 16 U.S.C. § 1361 (1982) *et seq.* ("MMPA"), is prevented from issuing a permit for one species because other species, for which a permit cannot lawfully issue, would inevitably be taken. Although the text of the statute does not provide a definitive answer to this question, the overall statutory scheme contemplates precisely the construction given by NOAA. In the MMPA, Congress created a species-based permit system that would enable fishing operations to carry on. The court's critical interpretive error, I believe, lies in its failure to give meaningful content to the species-based permit system established by Congress as an essential part of the legislative compromise embodied in the MMPA, a compromise evidenced by, on the one hand, the moratorium on the taking of marine mammals and, on the other hand, the system of permits for taking marine mammals in the course of fishing operations. By virtue of its interpretive approach, the court ultimately embraces a result that is so counter-intuitive that one must in conscience wonder whether a reasonable Congress would have desired the odd outcome of calling a complete halt to important fishing operations with clear foreign policy im-

plications.[1]

### A

In the same section of the MMPA enacting the moratorium on takings, section 1371(a)(2) makes the permit system an integral part of the overall statutory scheme:

Marine mammals may be taken incidentally in the course of commercial fishing operations and permits may be issued therefor under section 1374 of· this title subject to regulations prescribed by the Secretary in accordance with section 1373 of this title.

This language contemplates the incidental taking of marine mammals as long as certain statutory requirements are met. The noncasual reader will have noticed that section 1371(a)(2) makes reference to two other sections of the MMPA: section 1373, which charges NOAA with developing regulations governing the taking of marine mammals; and section 1374, which confers authority on NOAA to issue permits in accordance with certain statutory guidelines.

In sections 1373 and 1374, the statute plainly envisions that NOAA will issue permits on a species-by-species basis. For example, section 1373(a) directs NOAA to "prescribe ... regulations with respect to the taking ... of animals from each species of marine mammals...." Section 1374(b)(2)(A) provides that "[a]ny permit issued under this section shall specify the number and kind of animals which are authorized to be taken or imported." Finally, section 1373(c) authorizes NOAA to promulgate regulations that restrict the age, size, or sex of the marine mammals for which a permit may issue. Fishing operators, even experienced ones, obviously are not endowed with sufficient prescience to know in advance the age, size, or sex of the mammals they will take in the course of their operations; as a result, a moment's reflection suggests that *this provision necessarily means that operators will take some marine mammals even though a permit for that taking has not issued.* This is, of course, precisely how NOAA has interpreted the measure.[2]

The record thus suggests that Congress contemplated a situation in which NOAA could lawfully issue a permit for one species while at the same time denying a permit for another species that would inevitably be taken in the same fishing activity because the applicant had failed to jump through one of the MMPA-erected hoops, *see supra* note 2. In fact, in issuing its first General Permit to the Federation of Japan Salmon Fisheries Cooperative Association ("Federation"), NOAA observed that "the Japanese salmon fishery expects to take incidentally on a yearly basis in the U.S. [Exclusive Economic Zone ("EEZ")]" 5,500 Dall porpoise, 50 harbor porpoise, 25 Pacific white-sided dolphins, 25 killer whales, 25 Steller sea lions, and 450 northern fur seals. 46 Fed.Reg. 27057 (1981), Appellant App. at 402. *Even though the*

1. The Federation of Japan Salmon Fisheries Cooperative Association ("Federation") estimates that its fishing operations involve employment of approximately 51,861 people, including those engaged in distribution and processing associated with the industry. Statement of Shintaro Enomoto, Appendix of Appellant ("Appellant App.") at 349. The Federation calculated that it would have incurred losses in preparatory expenditures amounting to over $40 million had the District Court not stayed its temporary injunction for 20 days, thereby allowing fishing operations in the 1987 season. Affidavit of Shintaro Enomoto, Appellant App. at 59.

2. These provisions impose upon NOAA an obligation to make specific, affirmative findings with respect to *each* species for which a permit is issued before NOAA can issue a permit for the taking of that species. NOAA must ascertain the "existing levels of the species and population stocks" of the mammals to be taken, the optimum sustainable population ("OSP") of those mammals, and the impact of the takings of the OSP on the species. § 1373(d); *see also Committee for Humane Legislation v. Richardson,* 540 F.2d 1141, 1149–50 (D.C.Cir.1976). In making these assessments, NOAA must conduct hearings on the record, § 1373(d), and report to Congress annually on "the current status of all marine mammal species and population stocks" covered by the MMPA. § 1373(f). And, as an overriding concern in the permit structure, NOAA must assure that any permitted takings "not be to the disadvantage of those species." § 1373(a). Only if NOAA has jumped through each of these statutory hoops, among others, can it issue a permit for the taking of a particular species.

agency recognized that all these various species of mammals would be taken in the Federation's operations,[3] NOAA issued permits for only three species: Dall porpoise, Steller sea lions, and northern fur seals. NOAA explained that it had not yet been able to conduct the formal review necessary for a permit to issue under the Act for the other species, and that the "permit covering harbor porpoise, Pacific white-sided dolphin and killer whale remains unprocessed." Id. Instead, NOAA made clear, "[t]he permit and accompanying regulations allow no takings of harbor porpoise, Pacific white-sided dolphin, or killer whale. Takings of these marine mammals are in violation of and subject to prosecution under the MMPA." Id. at 27058, Appellant App. at 403. It is this permit, which assumed that other, nonpermitted mammals would also be taken (notwithstanding the moratorium), that Congress itself extended in amending the North Pacific Fisheries Act of 1954, 16 U.S.C. § 1021 et seq. ("NPFA"). History thus teaches us that both Congress and the agency charged with administering the MMPA contemplated that permits would be issued in circumstances in which nonpermitted takings would inevitably occur.[4]

Indeed, the legislative history of the statute buttresses the view that Congress considered and rejected a blanket prohibition on marine mammal takings in favor of a system of regulated takings within a permit structure. In debates on the Senate floor, Senator Ernest Hollings, in his capacity as Chairman of the Subcommittee on Ocean and Atmosphere of the Committee on Commerce and manager of the bill on the Senate floor, rejected the call for an "immediate ban on the taking of any and all marine mammals." 118 Cong.Rec. 25253 (July 25, 1972). Subsequently, in oversight hearings two years after the Act's passage, Congressman Dingell reaffirmed that "[i]t was not our intention

---

3. To borrow the language of the court, the agency knew this to be "not merely a remote possibility but a certainty." Maj. op. at 801; see also Maj. op. at 801 n. 13.

4. Appellees place particular emphasis on the nonpermitted takings of fur seals. There is some controversy among the parties about the number of fur seals likely to be taken in the Japanese salmon fishery. Despite some hints in the court's opinion to the contrary, Maj. op. at 798, the issue was fully joined in administrative proceedings below. Two different population stocks are at issue, namely, fur seals from the Pribilof Islands in the eastern Bering Sea off Alaska and fur seals from the Commander Islands in the Soviet Union.

Appellants do not appear to contest NOAA's determination that the Pribilof fur seals are legally depleted. See Reply Brief of Appellant Federation of Japan Salmon Fisheries Cooperative Association at 19 n. 24; Reply Brief of Federal Appellants at 4–5. The ALJ found that the Pribilof population had declined "from 1.8 million or thereabouts to something less than half of that over a period of ten or fifteen years." Recommended Decision of Hugh J. Dolan, Administrative Law Judge ("ALJ Decision") at 33, Appellant App. at 285. According to the ALJ, the population continues to decline at a rate of roughly 6.5% per year. Id. NOAA's proposed rule designating Pribilof fur seals as depleted estimated that their population had declined from 1.3 million in the late 1970's to 871,000 in 1983, a decline of one-third in less than a decade. 51 Fed.Reg. 47158 (1986), Appellant App. at 315. NOAA also estimated current [1986] population at 800,000. Id. An important cause of the decline in Pribilof fur seal population was found to be entanglement in discarded nets and debris, rather than set nets used in actual operations. Id. at 47159, Appellant App. at 316.

In contrast to the stock of Pribilof fur seals, the ALJ found the stock of Commander fur seals to be stable, if not increasing, and estimated the current population at 210,000. ALJ Decision at 33, Appellant App. at 285. The ALJ also noted that the stock sustains a harvest by the Soviet Union of about 4,000 to 5,500 fur seals annually. Id. at 34, Appellant App. at 286.

The court implies that as many as 450 fur seals might be taken in the Federation's fishing operations. See Maj. Op. at 801 n. 12. The agency's determination, however, was squarely to the contrary. The Federation estimated that the take of all fur seals would amount to an average of 45 per year. The ALJ accepted this figure and found it de minimis. Id. The Environmental Impact Statement ("EIS") also adopted this 45/year figure. EIS at 66, Appellant App. at 217.

Of these 45 fur seals likely to be taken annually, the ALJ calculated, as a matter of mathematical probability, that 10 would be taken from the Pribilof Island stock and that one out of those 10 would die. ALJ Decision at 35, Appellant App. at 287. There was, however, no direct evidence of even a single fur seal from the Pribilof stock ever having been taken. The ALJ's estimates were based on mathematical probabilities only.

that commercial fishing would be brought to a halt." Hearings on Oversight of the Marine Mammal Protection Act of 1972 before the Subcommittee on Fisheries and Wildlife Conservation and the Environment, 93d Cong., 2d Sess., ser. no. 93–24, at 22 (1974).

In light of this history, it is evident that the court has today created another hoop, nowhere to be found in the statute, through which NOAA must jump before it can issue a permit for the taking of marine mammals.[5] But this hoop is singular in its difficulty. The court's construction of the MMPA effectively requires that *no* permit for *any* species issue until a permit for *all* mammals likely to be entangled can lawfully issue. This far-reaching construction fails, I believe, to account for NOAA's obligation under the Act to fashion a workable permit system on a species-by-species basis.

### B

Two other factors support the view that Congress intended to achieve protection of marine mammals other than by a blanket prohibition inexorably halting all fishing operations. First, the MMPA clearly envisioned a gradual reduction in takings through new techniques and enforcement mechanisms, *see e.g.*, § 1380 (research grants), § 1381 (fishing gear development), § 1378 (international program), while permitting underlying fishing activity to continue. Second, the Federation is allowed to fish in waters subject to U.S. jurisdiction (the U.S. EEZ) pursuant to U.S. treaty obligations embodied in the International Convention for the High Seas Fisheries of the North Pacific Ocean ("INPFC"), May 9, 1952, 4 U.S.T. 380, T.I.A.S. No. 2786. The treaty, as amended in 1978, 30 U.S.T. 1095, T.I.A.S. No. 9242, provides for an area of approximately 775,000 square miles outside the U.S. EEZ in which North American-origin salmon and marine mammals are protected. The treaty allows, in return, Japa-

nese salmon fishing operations within an area of approximately 80,000 square miles inside the U.S. EEZ where the Japanese catch is primarily salmon of Asian origin. *See* Brief for the Federal Appellants at 4. Although the Federation's fishing activity within the U.S. EEZ is subject to regulation under the MMPA, Congress clearly envisioned the continuation of that fishing activity within the regulatory framework established by the statute.

In sum, the MMPA did not prohibit salmon gillnet fishing; rather, it *allowed* fishing to continue while at the same time placing a prohibition on marine mammal takings except to the extent that permits could be issued in accordance with statutory criteria for *each* species. Congress in fact contemplated precisely the anomalous situation that the court finds troubling. Maj. op. at 801–802. At the very least, Congress enacted a statutory scheme that places in tension the goal of total elimination of marine mammal takings and the need for a workable permit system administered in accordance with statutory criteria. *Chevron* and its progeny teach that we should defer to the reasonable resolution of that tension by the agency charged by Congress with the task of resolving it.

### II

In my view, NOAA's interpretation and administration of the MMPA is eminently reasonable. The Center for Environmental Education ("CEE") reasons, however, that NOAA's interpretation of the MMPA "create[s] an entire class of unreviewable takings fully outside the regulatory structure of the MMPA" because "the Secretary's approach allows takings *whether or not* the statutory requirements are met." CEE Brief at 33. The argument is essentially that once incidental takings are "allowed," if not "permitted," then one is entirely outside the statutory scheme and its rigorous criteria aimed at guiding permit issuance.

---

**5.** Although the MMPA provides for a full panoply of remedies, including vessel seizure and criminal sanctions, §§ 1374–1375, the statute does not provide for the remarkable remedy that the District Court has chosen to craft here

and that the court today affirms—that is, an injunction against issuing a permit for the taking of one species when another, for which no permit may lawfully issue, will inevitably be taken.

But NOAA has administered the Act in no such manner. Although rejecting the ALJ's recommendation to issue a permit for the taking of fur seals, NOAA explicitly credited the ALJ's finding that the number of seals that would nevertheless be unavoidably taken would not adversely affect that species' population. Decision of the Under Secretary at 2, 10, Appellant App. at 128, 136. As we indicated above, note 4 *supra*, NOAA took cognizance of the fact that the population of Commander Islands fur seals is subject to a managed commercial harvest of 4,000 to 5,500 animals per year. NOAA's determination is also supported by its estimate that native Alaskans would take several thousand Pribilof Islands fur seals for subsistence in 1987. 52 Fed.Reg. 26479 (July 15, 1987) (final notice); 52 Fed.Reg. 17307 (May 7, 1987) (notice and request for comment). NOAA concluded, reasonably, that the subsistence harvests of 1985 and 1986 had no effect on the growth of the population to higher levels. 52 Fed.Reg. at 26482. It was therefore reasonable for NOAA to conclude that the possible taking of only 45 fur seals per year—with a mortality rate of perhaps 10 of those—by the Federation was entirely consistent with the overall policies and purposes of the MMPA.

### III

We have seen thus far that Congress did not speak to the precise issue that the court decides today; that the MMPA's text, structure, and legislative history support the agency's interpretation; and that NOAA's administration of the statute represents a reasonable resolution of conflicting policies embodied in the statute. It is evident, then, under *Chevron*'s two-step analysis that judicial deference to the agency's reasonable interpretation is required. But in the present setting, several additional considerations point powerfully in favor of deferring to the agency's interpretation.

First, NOAA is charged with administering a statute which sets forth a *variety* of objectives (including a workable permit system, as described above). Under the MMPA, NOAA is obliged to take into account the following factors in administering the permit system:

(1) existing and future levels of marine mammal species and population stocks;

(2) existing international treaty and agreement obligations of the United States;

(3) the marine ecosystem and related environmental considerations;

(4) the conservation, development, and utilization of fishery resources; and

(5) the economic and technological feasibility of implementation.

§ 1373(b). Today, the court features only the first factor in its analysis. The agency, in contrast, is not at leisure to stop at factor number one, for it has a statutory duty to consider all five. The agency, in short, cannot call it a day upon completing only one-fifth of the Congressionally ordained exercise.

Second, the agency is undeniably *maximizing* the overall goal of the Act to reduce or eliminate marine mammal takings by the reasonable exercise of its regulatory power. In contrast, the result of today's decision raises the danger that the Japanese will terminate their treaty obligations under the INPFC. The overall result may very well be, ironically, reduced protection for marine mammals, if the Japanese fleet withdraws from fishing activity subject to NOAA regulation. That unhappy state of affairs would be but another testament to the recurring reality of unintended consequences. But there is another, closely related element as well. Because the statute specifically directs the agency to take cognizance of U.S. treaty obligations, it is particularly appropriate that the Executive be afforded reasonable latitude in administering a statute that touches on the arena of foreign policy.

Third, the issue before us is not a question of the agency's power (in the sense of its jurisdictional reach) in which deference to the agency might be less justified. *See ACLU v. FCC*, 823 F.2d 1554, 1567 n. 32 (D.C.Cir.1987); *American Mining Congress v. EPA*, 824 F.2d 1177, 1186–87 (D.C. Cir.1987). There is thus no reason to assume that NOAA is being less than dispas-

sionate in trying to balance the competing considerations before it. *Cf. Schwabacher v. United States,* 334 U.S. 182, 204, 68 S.Ct. 958, 970, 92 L.Ed. 1305 (1948) (Frankfurter, J., dissenting) ("Since the [ICC] disclaims rather than asserts a power, there is all the more reason to feel assured of its disinterestedness and to resolve ambiguity in favor of its choice of construction.") Rather, the statute requires the agency to apply the law to the facts at hand and to make judgments based upon a number of statutory criteria. What is more, the statutory scheme relies heavily upon the agency's technical expertise.

Finally, Congress has created an additional loop in the decisionmaking process in order better to assure the wisdom of NOAA's permit decisions. The MMPA requires NOAA to consult with the Marine Mammal Commission ("MMC") before prescribing regulations governing takings. § 1373(a). The MMC is a separate advisory body whose members are appointed by the President (with the advice and consent of the Senate) from a list of qualified individuals who must be unanimously agreed upon by heads of other specified Executive Branch agencies. § 1401. The statute thus provides a mechanism to ensure that individuals will provide their independent judgment and give environmental concerns their priority. The MMC has concurred fully with NOAA's interpretation of the Act. Reply Brief of the Marine Mammal Commission Before the United States Department of Commerce, National Oceanic and Atmospheric Administration, and National Marine Fisheries Service 30–31, Appellant App. at 311–12 (recommending that NOAA issue a permit for the taking of Dall's porpoise but deny permits for the fur seals and sea lions that would inevitably be taken). Moreover, in this particular case, NOAA consulted fully with the MMC and accepted the MMC's recommendation not to issue a permit for the taking of fur seals over the contrary recommendation of the ALJ. Decision of the Under Secretary 10, 14, Appellant App. at 136, 140. The advisory body's ratification of the agency's approach is thus but another factor suggesting the wisdom—quite apart from the legal requirement—of *Chevron* deference.

## IV

The court discerns support for its holding in two subsequent amendments to the MMPA. With all respect, the court misses the mark in assuming that Congress' action in these areas has a significant bearing on its intentions in the very different context of salmon gillnet fishing operations.

## A

The court reasons that the Federation's problems would be solved if the *de minimis* exception embodied in section 1371(a)(4)(A) had been enacted as originally proposed—that is, without the limitation to "citizens of the United States." Maj. op. at 802. The court infers from Congressional silence that Congress' intent as to this very different issue is so clear as to foreclose the agency's interpretation. In so reasoning, the court misapprehends, I believe, the purposes animating Congress in enacting the amendment.

Congress enacted this section because the procedures leading to an incidental take permit under section 1374 were so burdensome that many fishing operators would not apply for a permit authorizing their few incidental takes. H.R.Rep. 97–228, 97th Cong., 1st Sess. 14 (1981), U.S.Code Cong. & Admin. News 1981, pp. 1458, 1464. The exemption is thus activity-based. "Unless a particular activity takes only small numbers of marine mammals, and that taking has a negligible impact on the species, the new provisions of sections 101(a)(4) and (5) [16 U.S.C. § 1371(a)(4) and (5) ] are not applicable to that activity." *Id.* at 19, U.S. Code Cong. & Admin. News 1981, p. 1469. This section was not intended to apply to the situation faced by groups such as the Federation, which seek general permits to take thousands of marine mammals yearly. *See, e.g.,* 49 Fed.Reg. 1925 (1984) (General Permits issued to the North Pacific Fishing Vessel Owners' Association (3,605 mammals), Pacific Coast Federation of Fishermen's Association (2,790 mammals), and Japan (6,189 mammals)). As to the issue

before us, the *de minimis* exception is, with all respect, a fish out of water.

### B

The court reasons that Congress made special provision for purse-seine tuna fishing, loosening MMPA requirements by amending § 1371(a)(2) in 1981. Maj. op. at 802–03. The court, I believe, misapprehends the import of the 1981 amendment.

The language cited by the court does nothing to take purse-seine tuna fishing out of the rigorous permit requirements of the MMPA. Rather, the statute commands that fishing operators must make "best efforts" to reduce *killing* or *injuring* marine mammals, even if a permit for their *taking* has issued. Far from representing a "statutory relaxation," *id.*, the amendment mandates an additional goal to which the MMPA—heretofore concerned with regulating only "takings"—had not concerned itself. The change made eminent sense in the purse-seine fishing industry because the techniques used there meant that marine mammals, even though "taken" within the statutory meaning of the term, might easily be set free by use of appropriate techniques. The amendment, in effect, mandates that those techniques be used.[6]

### V

As I have attempted to demonstrate, powerful indications abound pointing in favor of the agency's interpretation in this case. Above all, had Congress wanted to stop all fishing operations in the Bering Sea in order to protect marine mammals from incidental takings, it could readily have done so. Instead, Congress enacted a statute creating a species-based permit system as an integral part of its provisions. Because today's decision robs those provisions of meaningful content and substitutes for a reasonable agency interpretation a rigid judicial construction of the stat-

ute, I am constrained respectfully to dissent.

---

**6.** In purse-seine fishing, two boats set a net around a school of fish. After the net encircles the school, the bottom of the net is tied together, entrapping the fish within. At that point, marine mammals caught within the net are "taken" within the meaning of the MMPA, but in many cases can still be let free without injury.